Lehrberg *v.* Felopulos.

IRENE LEHRBERG & others *vs.* J. PETER FELOPULOS & others.

Suffolk.   January 10, 1969. — June 5, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, SPIEGEL, &
REARDON, JJ.

*Partnership*, Mortgage of partnership property, Limited partnership, Accounting.   *Mortgage*, Of real estate: validity.   *Accounting*.

A mortgage of all the real properties of a limited partnership engaged in
the apartment house business, executed only by the three general part-
ners and given as security for a partnership note, was not illegal under
G. L. c. 109, § 9, nor void, although the general partners and mort-
gagee knew that the transactions were intended to carry out a proposed
"sale of the properties" by the partnership to one of the general part-
ners and that "the proceeds of the mortgage represented part of the
purchase price," and although the general partners intentionally with-
held from the limited partners any information relative to the mort-
gage and proposed sale and they never consented to or ratified the
mortgage transaction, where it appeared among other circumstances
disclosed in a suit in equity that the mortgage by the general partners
was expressly authorized by the partnership agreement and the limited
partners were prohibited from taking part in the sale of partnership
assets, that the decision of the general partners to sell the properties
was made in the exercise of business judgment as to what was best for
the partnership, and that there was no fraudulent intent, and it did
not appear that there was misuse of partnership assets by the mort-
gagee through application of part of the loan to discharge record en-
cumbrances on the properties, although some of the encumbrances
were attachments against general partners for personal debts.   [155]
Upon a settlement in a suit in equity of the accounts of a partnership and
a mortgagee of the partnership properties following dissolution of the
partnership, where it appeared that the mortgage loan had been made
for use of the proceeds as part of the price of a proposed purchase of
the properties by one of the partners and was advantageous to the
mortgagee as well as to the partnership and to the purchaser and that
the mortgage note and mortgage were in a face amount which included
a finance charge, but that the purchase did not take place, the mort-
gage note and mortgage were enforceable for only the amount actually
paid out by the mortgagee less sums repaid by the mortgagor, with
interest.   [157]

BILL IN EQUITY filed in the Superior Court on April 14,
1966.

The suit was heard by *Mitchell,* J.

*Bernard A. Dwork* (*Enid M. Starr* with him) for the plaintiffs.

*Harold Katz* (*S. Myron Klarfeld* with him) for Maurice Gordon.

WHITTEMORE, J.   A majority of the limited partners in Ridgeville Associates (Ridgeville) brought this class suit to determine the validity of a second mortgage of partnership real estate given on September 30, 1964, by the defendant general partners, Murray R. Fine, J. Peter Felopulos, and Richard W. Lubart, to the defendant Maurice Gordon and to determine the liability of the general partners to the plaintiffs or the partnership as a result of the execution of the mortgage.   All the parties other than Fine[1] have appealed from the final decree in the Superior Court that ruled the mortgage null and void, settled accounts between the parties and fixed and ordered paid the legal fees of the plaintiffs' attorneys.   The decree also ordered a receivership of the mortgaged properties as the sole assets of the partnership, the sale of the properties and the distribution of the proceeds.

The judge made a report of material facts.   The evidence is not reported.

The assets of the partnership were five apartment houses located in Cambridge and Somerville.   The properties were subject to first mortgages totaling about $600,000.   Fine had owned these properties in 1962.   He conceived of forming the partnership, and the plan for sale of the properties to it for $300,000.   He induced Lubart and Felopulos to become general partners with him.   The $300,000 capital was to be raised by selling $285,000 in limited partnership shares and by Fine's contributing on behalf of himself and the other general partners "$15,000 worth of equity in the properties." Lubart raised approximately $120,000 by selling limited shares with a face value of $126,500.   The titles to the properties were transferred by Fine to the partnership in September, 1962.   Fine received unsubscribed limited partner-

---

[1] Neither Felopulos nor Lubart filed briefs.

ship shares with a face value of $158,500. According to the final decree the then outstanding limited partnership shares represented an initial investment of $185,500. The number of shares outstanding is not stated.

The partnership agreement recited that upon taking title to the properties, the partnership would enter into a net lease with Fine leasing to him the properties for a term of twenty-one years "at an annual fixed net rental of $30,000 and such additional rental as is necessary to pay the interest and amortization under the aforesaid mortgages . . . ."

The lease to Fine was given as the agreement required. Under it he was to pay all expenses including taxes, repairs, capital improvements and interest on and amortization of the first mortgages. Fine and Lubart (but not the limited partners) knew that the lease was not a profitable one to Fine and that the performance of the lease would depend on Fine's "personal affluence."

Early in 1964 Fine proposed to Lubart that Ridgeville sell the properties back to him. Although Lubart did not at first agree, by June or July he became convinced that "there was a real danger that Fine would not be able to meet the monthly lease payments and that it would be in the best interest of the limited partners if the properties were to be sold, the proceeds used to pay back the limited partners, and the partnership dissolved."

Fine prepared a brochure offering the properties for not less than $301,000 and stating that he was making a "tip over" bid of $300,000. The sale was advertised. No bid other than Fine's was received and that bid was accepted.

Shortly before August 31, 1964, Fine applied to Gordon for a mortgage loan in order to go through with the purchase of the properties. Gordon examined the brochure and the properties and agreed to give Fine a loan of $260,000 for a period of three years at six per cent a year interest. This was subject to a finance charge such that the principal of the note was to be $311,000.

Gordon's attorneys refused to accept the title from Fine inasmuch as he was a general partner who would have

bought all the partnership assets without disclosure to the limited partners. Although the general partners had the power of sale the partnership agreement stated the intention of the general partners not to exercise the power without the consent of sixty-five per cent of the limited partners. The attorneys felt that in any event consent of all limited partners might be required. See G. L. c. 109, § 9 (1) (b).

The attorneys said that they would approve the mortgage if it was given by Ridgeville before any deed from Ridgeville to Fine was recorded. This proposed arrangement was acceptable to Fine. "It was understood by all present that the proposed loan to Ridgeville and the mortgage . . . [were] all part of a transaction involving the subsequent sale of the properties by Ridgeville to Fine." Gordon was told of the change and that the deed to Fine would be recorded after the mortgage.

From August 31, 1964, Gordon's attorneys were aware that Fine was a general partner of Ridgeville and that the loan was to permit him to purchase substantially all of Ridgeville's assets. One of Gordon's attorneys was present when the bids were opened and was aware of the results.

Gordon and his attorneys knew of the terms of the lease from Ridgeville to Fine. On September 29, 1964, Fine told Felopulos and Lubart of the proposal that the general partners give the note and mortgage. Lubart objected. A meeting was called by Fine at Gordon's office on September 30, 1964, at which Fine told the other two that the purpose of the meeting was to consummate the entire transaction. Lubart objected that the general partners should not be liable on the note as it was in substance a loan to Fine. To meet the objection Gordon gave Lubart and Felopulos a written agreement that they would not be personally liable on the mortgage note. Fine assigned to Ridgeville his loan agreement with Gordon. The general partners signed a termination of Fine's lease as required by the loan agreement. Gordon, his attorneys, and the general partners knew that this "released Fine from a substantial financial obligation . . . that the partnership was being

deprived of a valuable asset." The general partners executed a mortgage note for $311,000 and a mortgage securing the note. Fine and his wife indorsed the note.

The title examination by Gordon's attorneys had shown encumbrances on the properties as follows:

| | |
|---|---:|
| Somerville taxes | $ 2,290.77 |
| "        " | 4,208.60 |
| "    water bills | 183.30 |
| Cambridge taxes | 607.19 |
| First mortgage arrearages | 14,043.36 |
| | $21,333.22 |

At the September 30 meeting the general partners, "at the direction and insistence" of Gordon's attorneys, indorsed a series of checks drawn by Gordon and payable to Ridgeville. These totaled $21,333.13 (compare total above of $21,333.22) and were used to pay off the municipal liens and the first mortgage arrears. A check for $650 to pay the attorneys for their services was also indorsed by the several partners.

. Gordon's attorneys and the general partners knew that the instruments and the checks executed on September 30 were "part of a transaction for the sale of the properties by Ridgeville to Fine, and that the proceeds of the mortgage represented part of the purchase price."

On October 1, 1964, Gordon's attorneys recorded the termination of the lease and the mortgage. They had, in the meantime, learned of other record encumbrances, that is:

| | |
|---|---:|
| Attachment of real estate under action on a personal note of Fine | $32,460 |
| Tax lien for a tax owed by Felopulos | 1,500 |

The attorneys insisted that these amounts be withheld from the mortgage proceeds. They were then in a position to terminate the transaction without loss to Gordon. On October 2 the attorneys handed Fine a check for $32,460 knowing that he would use it to pay his personal obligation

on the note. After obtaining the indorsement of the other general partners, Fine used the check to obtain another check payable to himself and used that check to release the attachment.

On November 5, 1964, the attorneys gave a check for $1,500 to Felopulos which was specially indorsed to him and was negotiable. Felopulos retained this amount and delivered a release of the lien.

Gordon from and after the September 30, 1964, meeting and until many months later when the limited partners made claim against him, believed that at that meeting the properties had been sold to Fine and "that the proceeds of his mortgage loan were used as a part of the purchase price."

About October 2, 1964, Gordon's attorneys handed Fine two treasurer's checks payable to Ridgeville respectively for $75,556.87 and $128,500.[2]

Fine obtained the indorsement of Felopulos and Lubart on the $75,556.87 check and deposited it in his personal account. On October 8, when the general partners met, Lubart demanded the $75,556.87. Fine told his partners he had spent it on his personal obligations. For about a month thereafter Felopulos and Lubart allowed Fine to operate the properties but insisted that all checks be cosigned by one of them. They intentionally withheld from the limited partners any information as to the arrangements to sell to Fine and to mortgage to Gordon and as to how the proceeds had been used.

Lubart operated the properties from about December, 1964, to May, 1966. Since the latter date Gordon has operated them as mortgagee in possession. Before May, 1966, the general partners used the $128,500 for what the

| [2] Mortgage Loan | $260,000.00 |
|---|---|
| Checks to clear title | 21,333.13 |
| | 32,460.00 |
| | 1,500.00 |
| Attorneys fee | 650.00 |
| Net proceeds of loan | 75,556.87 ⎫ |
| | 128,500.00 ⎭ |
| | $260,000.00 |

judge found to be proper partnership purposes including the use of slightly over $80,000 to repurchase limited partners' shares. By November 1, 1965, Ridgeville was without funds. On that date the general partners executed instruments dissolving the partnership. At a meeting called for November 5, 1965, Lubart and Felopulos for the first time notified the limited partners of the financial condition of Ridgeville and the reasons for it. The limited partners never consented to or ratified the mortgage transaction with Gordon.

From October 1, 1964, to May, 1966, Ridgeville paid Gordon on the mortgage note $44,058.39. After May, 1966, Gordon by action at law recovered $1,800 from the assets of Ridgeville.

The judge found that the execution of the mortgage and the proceeds of the loan were for the benefit of Fine and not for partnership purposes. He ruled that the mortgage was not enforceable. He stated the account between Ridgeville and Gordon as follows:

| | |
|---|---:|
| Used by Ridgeville for partnership purposes | $128,500.00 |
| Used to discharge liens on Ridgeville's properties | 21,333.13 |
| | $149,833.13 |
| Repaid by Ridgeville | 44,058.39 |
| Enforceable by Gordon with a lien, subordinate to the claims of limited partners for their shares and all claims of the receiver for allowable claims and expenses | $105,774.74 |

In the event of a sale of the properties the judge also ordered paid to Gordon any excess remaining after paying these prior obligations. The foregoing was embodied in the final decree as was an order that Felopulos pay Gordon $1,500 and that Fine pay him $108,016.87 ($75,556.87 + $32,460).

The final decree, as noted, appointed a receiver and ordered that Gordon account to the receiver for his activities while in possession and to pay the net sum due to the receiver.

The final decree ordered $20,000 paid to counsel for the plaintiffs to be paid as follows: one third from the amounts realized by the receiver after payment of expenses of current operations and his fees and expenses; one third by Gordon from the amounts recovered by him under the decree; and one third by Fine, Felopulos and Lubart jointly or severally. The court retained jurisdiction.

The mortgage, in our view, was not void. The general partners, by para. 13 (b)[3] of the agreement, had express power to mortgage all the property. General Laws c. 109, § 9, did not make the mortgage illegal. It was not an assignment of property "for other than a partnership purpose" (§ 9 [1] [d]) nor was it an act which made it "impossible to carry on the ordinary business of the partnership" (§ 9 [1] [b]), so that consent of the limited partners was required. Compare *Back Bay Natl. Bank* v. *Brickley,* 254 Mass. 261, 266 (loans made for other than "the use and advantage of the partnership"). The knowledge of Gordon and his attorneys that the mortgage was to be a step in a plan whereby Fine would obtain the properties and Ridgeville would receive $300,000 did not make the mortgage itself void. Certainly, it was not (as the judge concluded it was) made solely for Fine's benefit.

Awareness of possible legal difficulties confronting Fine and the other general partners did not cast on Gordon the duty to see that the Ridgeville to Fine sale complied with the law. The decision of the general partners to resell the properties to Fine was, it appears, made in the exercise of business judgment as to what was best for the partnership. It was a decision that could reasonably be made by partners having the power to act. Gordon's notice was of a plan to convert an equity in real properties into cash, not of an intent to take partnership assets for the personal use of acting part-

---

[3] The general partners "in their absolute discretion have the power . . . to mortgage all or any part of the Property . . . ."

ners.   For Fine to go through with his proposal, required that he furnish or raise from other sources funds to supplement the $260,000 that would come from Gordon.[4]   The record does not show that Fine lacked resources to do this nor that it was unreasonable for Gordon to believe that the sale to Fine had been completed.   ·

There being no fraudulent intent disclosed or suggested, Gordon could rely on the partnership agreement.   In addition to the power to mortgage it gave the general partners "all of the powers and rights of Partners in a partnership without limited partners under the Partnership Law of the Commonwealth of Massachusetts."   (Para. 13 [b] [iv])   The agreement also provided "Nothing herein contained shall require any grantee to investigate the General Partners' authority to sell and convey the Property . . . nor require any such grantee to inquire as to whether the approval of the Limited Partners . . . has been first obtained."   (Para. 13 [c])   This was emphasized by the provision (para. 14) that "The Limited Partners shall take no part in . . . the sale, leasing or refinancing of . . . [Ridgeville's] assets . . . ."

In the circumstances the plaintiffs have not proved a misuse of Ridgeville's assets by Gordon by showing that Gordon's attorneys drew and delivered checks to be used to discharge the personal attachments, the presence of which caused the attorneys to be unwilling to pass the title.   The issue is not whether these were valid attachments under G. L. c. 108A, § 25 (c) ("A partner's right in specific partnership property is not subject to attachment or execution, except on a claim against the partnership").   The point is only that the attorneys would not advise Gordon that the title was clear to their satisfaction (as the mortgage agreement required) while these record encumbrances were outstanding.   This did not cause the checks that had been drawn and delivered to Ridgeville to be other than payments to it.

---

[4] $40,000.00   ($300,000 less $260,000)
   55,293.13   (record encumbrances including $1,500 Felopulos' lien)

$95,293.13

We construe the finding that Gordon's attorney insisted that the amounts of the personal attachments be withheld from the mortgage proceeds to mean no more than that they stated that if the general partners wished to go through with the mortgage these attachments must be removed. There is no basis for assuming that the attorneys took the initiative in using mortgage proceeds for this purpose.

Although the mortgage is not void, its face does not determine the amount for which, equitably, it may be enforced. The proposal of Gordon's attorneys was to modify the original plan as a means of accomplishing what was first intended. The plan, in its mortgage aspect, was advantageous to Gordon as well as to Ridgeville and Fine. Gordon's attorneys suggested and managed the details of the substitute plan. It is not determinative of the equities that the primary responsibility to see that Ridgeville got its $300,000 lay with the general partners. Ridgeville did not receive its money because a three way trade broke down when only partly accomplished. We rule therefore that Gordon's recovery is to be limited to his payments, thus restoring his prior position. The note and mortgage are therefore now enforceable for $260,000, less the repayments of principal made by Ridgeville. Interest should be computed at six per cent on $260,000 or the unpaid balances thereof. The second mortgage lien should not in equity be subordinated to the claims of the limited partners. Gordon's obligation to account for his operation of the properties is only that of a mortgagee in possession.

The mortgage note is of course a valid obligation of Fine and his wife. Fine is liable to Ridgeville for the damages resulting from his failure to purchase the property as he agreed.

We discern no reason why Gordon should be charged with the $75,556.87 embezzled by Fine. See *Reed* v. *Bacon*, 175 Mass. 407, 414. This is due from Fine to Ridgeville. Fine also owes Ridgeville $53,793.13 and Felopulos owes Ridgeville $1,500.

The finding that the use of slightly over $80,000 to re-

purchase shares was for a partnership purpose was incidental to the judge's determination of the extent of Gordon's liability. It should not foreclose the receiver in collecting funds due the estate. Therefore, without passing on its validity, we set that finding aside. This will permit determination in this or other proceedings of liability, if any, of general partners or of limited partners in respect of such payments. The decree to be entered pursuant hereto shall be without prejudice to such determination. On that issue, see G. L. c. 109, § 16 (1); the partnership agreement, paras. 9 (a), 16 (c) and 17 (b).

The findings and decree do not adequately present for our decision whether the general partners are liable to Ridgeville for not holding onto the properties until $300,000 was in hand, or because of their indorsing and delivering to Fine the check for $75,556.87. We intend no intimation, but the decree shall be without prejudice to presenting such issues for adjudication in this or other proceedings.

Whether any counsel fees should be awarded in this class suit and in what amount must be determined at a later date in the Superior Court in the light of funds recovered and the strict rules applicable. See *Shaw* v. *Harding*, 306 Mass. 441, 450, and cases cited; *Commissioner of Ins.* v. *Massachusetts Acc. Co.* 318 Mass. 238, 242–246; *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101, 129.

The final decree is reversed. A decree is to enter in accordance with our rulings herein.

*So ordered.*