PETER WASSERMAN *vs.* MAX WASSERMAN & another.

Middlesex.    February 12, 1979. — March 12, 1979.

Present: HALE, C.J., GRANT, & DREBEN, JJ.

*Partnership*, Limited partnership, General partner, Consent of limited partner.

A provision in a partnership agreement giving the general partner the authority to designate as a general partner any of certain specified persons without approval of the limited partners constituted the written consent of the limited partners to such a designation as required by G. L. c. 109, § 9(1)(*e*). [172-175]
The execution of an amendment to a certificate of limited partnership by a general partner acting as the attorney in fact of the limited partners, as expressly authorized by the partnership agreement, satisfied the requirements of G. L. c. 109, § 25(1)(*b*). [176-177]

CIVIL ACTION commenced in the Superior Court on December 29, 1977.

Motions for summary judgment were heard by *Hallisey*, J.

*Marc Redlich* for the plaintiff.
*Harold Rosenwald* for the defendants.

GRANT, J. This is an action brought in the Superior Court by Peter Wasserman (Peter) against Max Wasserman (Max) and Jeanne L. Wasserman (Jeanne) by which Peter seeks to establish his position as the sole general partner of a limited partnership known as Sherman Associates, an order that Max and Jeanne turn over to him the books and records of the partnership, an injunction against their interfering with his management of the affairs of the partnership, and an accounting with respect to certain fees which the partnership has paid Jeanne for her services in managing the real estate owned by the partnership. The action was heard and determined on cross motions for summary judgment. Peter's motion was denied, the defendants' motion was allowed, and Peter has appealed from the ensuing final judgment of dismissal.[1] We summarize the undisputed facts established by the admissions in the pleadings, the affidavits, and the depositions on which the motions were heard.

On January 4, 1971, Max and Jeanne entered into a written agreement of limited partnership for the purpose of acquiring, constructing and operating a project of low and moderate income housing in Cambridge.[2] By the terms of that agreement Max was constituted the sole general partner of the partnership, and Max and Jeanne became the only Class B limited partners.[3] The agreement expressly provided, among other things, that it had

[1] Peter also took the superfluous step of filing a notice of appeal from the orders denying his motion and allowing the defendants' motion. See the second paragraph of Mass.R.A.P. 3(a), 365 Mass. 846 (1974).

[2] See Morville House, Inc. v. Commissioner of Corps. & Taxn., 369 Mass. 928 (1976); Community Dev. Co. v. Assessors of Gardner, 377 Mass. 351 (1979).

[3] Max and Jeanne continued to be the only two Class B limited partners until June 4, 1975, when Max assigned his limited partnership interest to Jeanne. The outsiders who were brought in subsequent to the amendments of July 15, 1971, became Class A limited partners. Nothing in this case turns on whether any of the limited partners fell within one class or the other.

been made and entered into pursuant to the provisions of the Uniform Limited Partnership Act (Act) found in G. L. c. 109 (§ 28) and that the general partner (Max) should have "no authority to . . . admit a person as a general partner" (§ 15.5[v]). The certificate required by § 2(1) of the Act (G. L. c. 109, § 2[1]) was executed by Max and Jeanne in the capacities already indicated, was sworn to by them, and was filed with the Secretary of the Commonwealth on February 9, 1971.

On or about July 15, 1971, Max and Jeanne entered into an agreement in writing which superseded and recast the provisions of the agreement of the previous January. Max continued as the sole general partner, and Max and Jeanne continued as the only Class B limited partners. Section 10.2 of the amended agreement reads in material part as follows: "At any time the then General Partners or Partner by unanimous consent or in the event there shall be no General Partners, Wasserman Development Corporation,[4] . . . may designate any one or more of the following individuals to become a General Partner without approval of any Limited Partner: (1) Any officer or director of Wasserman Development Corporation or Jacet Construction Corporation.[5] (2) Any fiduciary under the will or a trust instrument of Max Wasserman. (3) Any other Person whose designation shall receive the consent of the Limited Partners[6] . . . . This agreement shall constitute the written consent of every Limited Partner to admit as a General Partner any

---

[4] This corporation, which appears to be controlled by Max, had been mentioned in the original partnership agreement as a potential lessee of the entire project.

[5] This corporation had been identified in the original agreement as the concern which was expected to construct the project. Max's relationship to this corporation does not appear.

[6] The words "Consent of the Limited Partners" are defined in the amended agreement as "the written consent or approval of Class A Limited Partners whose aggregate Capital Contributions represent at least sixty percent (60%) of the Class A Class Contribution."

Person designated in the manner above provided." Section 15.5 of the amended agreement provides that it "shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts." The agreement was signed by Max in his capacities as the general partner and a Class B limited partner and by Jeanne in her capacity as a Class B limited partner. Acting in those same capacities, Max and Jeanne executed, swore to, and, on October 14, 1971, filed with the Secretary of the Commonwealth an amendment of the certificate of limited partnership. See § 25(1) of the Act (G. L. c. 109, § 25[1]).

Following the execution of the foregoing amendment of the partnership agreement, fourteen persons were admitted as Class A limited partners of Sherman Associates. Each of the fourteen signed a counterpart of the amended agreement.[7] On March 3, 1972, there was filed with the Secretary of the Commonwealth a second amendment of the certificate of limited partnership which reflected the admission of the Class A limited partners and which was signed and sworn to by Max as the general partner and as a Class B limited partner and by Max as "attorney in fact" for Jeanne and all the Class A limited partners.[8]

At some point (the actual sequence of events is not clear from the record) Max, as the general partner, entered into an agreement with Jeanne, as the principal of a concern known as Sandell Management Company, under which the partnership agreed to pay Jeanne six percent of the gross collections from the operation of the project for her services in managing the project.[9] The agreement

---

[7] All fourteen were admitted "as of" June 24, 1971, which may have been the date on which they signed their respective subscription agreements.

[8] In part 2 of this opinion we shall consider the general partner's authority to act for the limited partners in this respect.

[9] Section 6.9 of the amended agreement authorizes the general partner, acting in the name and behalf of the partnership, to enter into agreement with "any Affiliated Person in an independent capacity as distinguished from his . . . capacity as a Partner"; the definition of an

with Jeanne was to last through May 31, 1977, and has yielded her a gross of approximately $42,000 annually.

On January 21, 1975, Max, utilizing the letterhead of Wasserman Development Corporation, wrote each of the limited partners, advising them that the project had been fully rented and was showing a positive cash flow, that he desired to retire, and that he intended to name Peter as the general partner of Sherman Associates pursuant to the provisions of the above quoted § 10.2 of the amended partnership agreement.[10] On February 3, 1975, Max, purporting to act under § 10.2, executed a formal written designation of "Peter W. Wasserman, Vice President of Wasserman Development Corporation to be a new general partner of the Partnership," subject to the performance of certain conditions which were later fulfilled.[11] On March 1, 1975, Max executed a written assignment to Peter of Max's entire interest as general partner of the partnership. On March 10, 1975, Peter executed a written acceptance of his designation as general partner, in which he agreed to be bound by the terms and provisions of the amended partnership agreement.

On March 18, 1975, there was filed with the Secretary of the Commonwealth a third amendment of the certificate of limited partnership which recited on its face that it was being filed "[i]n order to reflect the admission of

---

"Affiliated Person" includes any "member of the Immediate Family of any General Partner"; and "Immediate Family" is defined in such fashion as to include both Jeanne and Peter. No question has been raised as to the propriety of Max's entering into the original agreement with Jeanne. See *Riviera Congress Associates* v. *Yassky*, 25 App. Div. 2d 291, 295, aff'd 18 N.Y. 2d 540 (1966).

[10] The copies of this letter which appear in the record bear the date of January 21, 1974, but it is clear from the context of events that the letters were actually sent on January 21, 1975.

[11] It is agreed that Peter was an officer of Wasserman Development Corporation on February 3, 1975, but the record does not disclose the date when he became one. It has not been argued (see Mass.R.A.P. 16[a][4], as amended, 367 Mass. 921 [1975]) that any significance should attach to the actual date.

Peter Wasserman as an additional general partner and the subsequent retirement of Max Wasserman as general partner." This amendment was signed and sworn to by Max as "former General Partner and Class B Limited Partner," by Peter as "General Partner," and by Peter as "attorney-in-fact" for Jeanne and all the Class A limited partners.

Between March 1, 1975, and May 31, 1977, Peter performed various functions which would normally be expected of the general partner, such as the execution and filing of the partnership's Federal income tax returns for the years 1975 and 1976 and the execution and delivery of various financial reports required by the United States Department of Housing and Urban Development. In May, 1977, Peter notified Jeanne that the partnership would not renew the aforementioned management agreement which Max had entered into with her and which was due to expire on May 31, 1977. Max and Jeanne immediately took the position that Max was still the sole general partner of Sherman Associates, and on May 19, 1977, Max purported to extend the life of the agreement with Jeanne until May 31, 1979.[12] Those actions, and Max's refusal to deliver the partnership books and records to Peter, led to the commencement of the present action.

1. The principal controversy between the parties is as to the effect which should be given to the provisions of § 9(1)(e) of the Act (G. L. c. 109, § 9[1][e]), which reads: "A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to ...

---

[12] The record does not disclose whether any payments have in fact been made to Jeanne for any management services she may have rendered on or after June 1, 1977.

[a]dmit a person as a general partner." Peter contends (1) that Max and Jeanne gave the only consent required by § 9(1)(e) when, as limited partners, they signed the amended partnership agreement of July 15, 1971, and (2) that, in any event, they have, by their subsequent actions, consented to or ratified Max's actions in substituting Peter as the sole general partner. Max and Jeanne dispute both propositions and rely on affidavits submitted by Jeanne and by two of the Class A limited partners to the effect that none of them has, as matter of fact, consented to or ratified any such substitution.[13]

We think it advisable, before proceeding to the merits, to eliminate one point which appears to have escaped counsel, namely, that Max has no standing as a limited partner to invoke the provisions of § 9(1)(e) because he has long since assigned to Jeanne the only interest he ever had as a limited partner of Sherman Associates. We also think it important for the reader to understand that there is nothing in the record to suggest that any resolution of the issues presented in this case would result in prejudice to the rights of any creditor of the partnership or in the imposition of personal liability of any of the limited partners.

It is clear to us, as matter of construction, that the purpose and intent of § 10.2 of the amended agreement of partnership (*supra* at 169-170) were to express and supply in advance, and without prior consultation with them, whatever consent might be required of the other limited partners to Max's designation as a general partner of "(1) Any officer or director of Wasserman Development Corporation or Jacet Construction Corporation [or] (2) Any fiduciary under the will or a trust instrument of

---

[13] The papers disclose that each of the fourteen Class A limited partners is aware of the present litigation. None of them has sought to intervene in the action, and we reject the notion that either Max or Jeanne has any standing to assert or defend the rights of any of the other limited partners. See *Morison* v. *Assessors of Brookline*, 313 Mass. 746, 749 (1943).

Max Wasserman" and that Max was to be required to consult and obtain the consent of the other limited partners only in the event he should wish to designate "(3) Any . . . person" not embraced within (1) or (2). Given (a) the fact that (1) was preceded by the words "without approval of any Limited Partner" and (b) the concluding sentence ("This agreement shall constitute the written consent of every Limited Partner to admit as a General Partner any Person designated in the manner above provided"), we see no other sensible construction of § 10.2.

The question remains whether an agreement such as the foregoing can constitute the "written consent" contemplated by § 9(1) of the Act (G. L. c. 109, § 9[1]). The question was left unanswered in *Lehrberg* v. *Felopulos,* 356 Mass. 148, 155 (1969). However, the cases from other jurisdictions which have considered the question have either held or assumed that the required consent can be found in the express provisions of a partnership agreement. See *Mist Properties, Inc.* v. *Fitzsimmons Realty Co.,* 228 N.Y.S.2d 406, 410 (Sup. Ct. 1962) ("There clearly appears to have been no violation of [§ 9(1) of the Act] since the conveyance was not without the written consent of the limited partners but was specifically contemplated and provided for by the agreement."); *United States* v. *Mansion House Center No. Redev. Co.,* 426 F. Supp. 479, 480-481 (E.D. Mo. 1977); *Newburger, Loeb & Co.* v. *Gross,* 563 F.2d 1057, 1065, 1068, 1074-1075 (2d Cir. 1977), cert. denied, 434 U.S. 1035 (1978). The rationale appears to have been that in the absence of an express prohibition, the Act leaves the members of a limited partnership free to determine their rights with respect to each other by any contractual agreement which does not contravene public policy or run afoul of the common law. See, e.g., *Lanier* v. *Bowdoin,* 282 N.Y. 32, 38 (1939), rehearing denied, 282 N.Y. 611 (1940); *Meissel* v. *Finley,* 198 Va. 577, 584 (1956); *Mist Properties, Inc.* v. *Fitzsimmons Realty Co.,* 228 N.Y.S.2d at 410; *Riviera Congress Associates* v. *Yassky,* 25 App. Div. 2d 291, 295-296, aff'd 18 N.Y. 2d 540

(1966); *Weil* v. *Diversified Properties*, 319 F. Supp. 778, 781 (D.D.C. 1970).

Jeanne points to § 401 of the Revised Limited Partnership Act approved by the National Conference of Commissioners on Uniform State Laws in 1976, and particularly to the Commissioners' Comment thereon. Section 401, if enacted, would read as follows: "After the filing of a limited partnership's original certificate of limited partnership, additional general partners may be admitted only with the specific written consent of each partner." The comment reads: "Section 401 is derived from Section 9(1)(e) of the prior law and carries over the unwaivable requirement that all limited partners must consent to the admission of an additional general partner and that such consent must specifically identify the general partner involved." See 6 U.L.A. (Master ed. 1969), 1979 pocket part at 130. We see nothing in the proposed new section, or in the comment, which precludes a conclusion that the written consent contemplated by § 9(1)(e) can be found in the provisions of a partnership agreement. The purpose of that section, as well as of the proposed new section, is to give each limited partner, who has no voice in the operation of the partnership business, the opportunity to prevent his investment from falling into the hands of an unknown or unwanted general partner. We think that purpose was served by the express provisions of § 10.2(1) of the amended partnership agreement in the present case. Nor do we perceive any difficulty with the Commissioners' concern for specificity; Jeanne, who is Max's wife and Peter's mother, is hardly in a position to say she did not know who controlled Wasserman Development Corporation or that Peter was a stranger to her or the corporation.

We hold that Jeanne gave her consent to the designation of Peter as a general partner when she signed the amended partnership agreement of July 15, 1971. Accordingly, it becomes unnecessary to consider whether Jeanne may also have consented to or ratified that designation in 1975 or at any subsequent time.

2. Jeanne points to the provisions of § 25(1)(b) of the Act (G. L. c. 109, § 25[1][b]),[14] points out that she did not sign or swear to the third amendment of the certificate of limited partnership which reflected Peter's admission as a general partner and which was filed with the Secretary of the Commonwealth on March 18, 1975, and (if we understand her) seeks to argue from there that the designation of Peter was a nullity. It is true, as already noted, that Jeanne did not personally sign or swear to the amendment in question. Peter signed as her "attorney-in-fact" pursuant to the express authorization she had given in § 10.4 of the amended partnership agreement.[15] We reject any argument such as Jeanne appears to advance.[16] In the absence (as here) of circumstances which might result in prejudice to creditors or in the imposition of personal liability on the limited partners, it has uniformly been held that the members of a limited partnership are bound to each other by the contractual provisions of their partnership agreement, even in the absence of a valid certificate of limited partnership. See *Meissel* v. *Finley,* 198 Va. at 584; *Hoefer* v. *Hall,* 75 N.M. 751, 754-755 (1966); *Brown* v. *Brown,* 15 Ariz. App. 333, 339 (1971).

---

[14] "The writing to amend a certificate shall ... [b]e signed and sworn to by all members, and an amendment ... adding a ... general partner shall be signed also by the member to be ... added ...."

[15] "Upon [the] admission of a new General Partner ... an amendment to the Certificate of Limited Partnership ... reflecting such admission, shall be filed with the Secretary of the Commonwealth. The General Partners, and each of them, are hereby constituted the attorneys-in-fact of all Limited Partners to execute, acknowledge, swear to and deliver such instruments as may be necessary or appropriate to carry out the foregoing provisions of this Article X, including ... amendments to the Limited Partnership Certificate required by statute...." An even broader provision concerning the same subject matter is found in § 15.1 of the amended agreement.

[16] It has already been noted that Max signed and swore to the second amendment of the certificate of limited partnership as "attorney in fact" for all the fourteen Class A limited partners. If Jeanne is correct in her present contention, there is a possibility that there are no Class A limited partners of Sherman Associates.

Our concurrence in the reasoning and result of those cases obviates the need to consider any of the other contentions advanced by Jeanne with respect to § 25 of the Act.

3. The order allowing the defendants' motion for summary judgment and the judgment are reversed. The Superior Court is to make a summary determination of the question whether any payment of partnership funds has been made to Jeanne on account of any managerial services she may have rendered on or since June 1, 1977 (see note 12, *supra*); if no such payment has been made, a new final judgment is to be entered which orders Max and Jeanne to deliver the books and records of the partnership to Peter and which enjoins Max and Jeanne from interfering with Peter's performance of his duties as the sole general partner of the partnership; if there has been any such payment to Jeanne, a like final judgment is to be entered under the provisions of the first sentence of Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), and the case is to stand for an accounting to the partnership by Max and Jeanne. Costs of appeal are not to be awarded to any party.

*So ordered.*