R.S. BRANDT, K.M. LUNDIN,     )
M.I. LUNDIN, N.B. LUNDIN,     )
and A.T. WILTSHIRE, JR.,     )
          ) Appeal No.
    Plaintiffs-Appellees,     ) 01A01-9708-CH-00431
          )
v.     ) Lawrence Chancery
          ) No. 5965-92
BIB ENTERPRISES, LTD., A     )
Tennessee Limited Partnership,     )
and GREGORY SMITH, Individually,     )
and VIRGINIA ABERNETHY,     )
          )
    Defendants-Appellants.     )

**FILED**

**August 5, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

APPEALED FROM THE CHANCERY COURT FOR LAWRENCE COUNTY AT LAWRENCEBURG, TENNESSEE.

THE HONORABLE WILLIAM B. CAIN, CHANCELLOR

WILLIAM S. FLEMING, FLEMING
HOLLOWAY, FLYNN & SANDS, P.C
207 West Eighth Street
Columbia, TN 38401
    For Plaintiffs-Appellees.

HENRY, HENRY, STACK, GARNER & SPEER, P.C.
119 South First Street
Pulaski, TN
    For Defendants-Appellants.

**AFFIRMED AS MODIFIED, AND REMANDED**

                **HERSCHEL P. FRANKS, JUDGE**

CONCUR:

GODDARD, P.J.
McMURRAY, J.

This cases involves a dispute over a limited partnership. BIB Enterprises, Ltd. ("BIB") was formed on December 30, 1982 for the stated purpose of acquiring real estate, equipment and other personal property of a Bonanza Restaurant in Lawrenceburg, Tennessee. Defendant-appellant Greg Smith was named General Partner.

On December 31, 1982, BIB entered an agreement with Dinero Enterprises, Inc. for the lease of BIB's real and personal property. In November, 1994, Dinero defaulted on the lease. BIB entered a lease with Southeast Restaurants, Inc. ("Southeast") on January 1, 1985. In late 1985, the Bank of Loretto, which had financed BIB's purchase of the Bonanza Restaurant, failed and was taken over by the F.D.I.C. BIB purchased its note from the F.D.I.C. at a discount. The money to purchase the note was provided by a bridge loan from Dominion Bank. Smith negotiated permanent financing through Community Bank and Trust.

In 1991, Southeast filed for bankruptcy. After securing a new tenant, Smith arranged to sell the property at auction. The auction was held on August 18, 1992. Smith purchased the property for $242,500.00.

The Plaintiffs-appellees filed suit against BIB and Greg Smith on December 3, 1992, alleging that the sale of the partnership property to Smith was void and requesting an accounting. The Plaintiffs later amended their complaint to add additional defendants and further alleged that Smith breached his fiduciary duties and committed acts of embezzlement and misrepresentation. On November 14, 1994, the Plaintiffs moved for Partial Summary Judgment on the issues of which law governed the transactions, the sale of the partnership property and Smith's renewal of his contract for management services. On February 15, 1995, the trial court filed a

2

Memorandum of Summary Judgement finding that the sale of the assets was null and void and that the Uniform Limited Partnership Act governed the dispute. The trial court entered its Order on the Motion for Partial Summary Judgment on March 7, 1995.

The parties sought an interlocutory appeal, which was denied. After a trial on the remaining issues, the trial court issued an opinion on October 29, 1996. The trial court determined that Smith had no authority to extend his base management fee beyond the terms of the original agreement. The trial court also determined that the Southeast equipment deal and the F.D.I.C. discount did not count as compensable sources of income for Smith.

The October 29 memorandum adjudicated all issues up to the purported sale of the restaurant on September 10, 1992. The trial court held an additional hearing on June 17, 1997 in order to adjudicate all remaining issues. The trial court determined that Smith owed the partnership $53,516.77. The trial court also found that the Plaintiffs were not entitled to a judgment against Smith's wife, Virginia Abernathy. The trial court denied Plaintiffs' request for attorney's fees, discretionary costs and prejudgment interest and ordered the dissolution of the partnership.

The trial court properly determined that the Uniform Limited Partnership Act ("Uniform Act") governed this case. Appellants contend that the Revised Uniform Limited Partnership Act ("Revised Act") is applicable. The record does not contain any evidence, however, that the Appellants made the necessary election to be governed by the Revised Act.

This issue was decided by summary judgment. Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Tenn.R.Civ.P. 56.03. If both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one

3

conclusion, summary judgement should be granted. *Shadrick v. Coker*, 963 S.W.2d 726 (Tenn. 1998)(citations omitted).

The partnership in this case was formed in 1982. At that time, the Uniform Act was the governing law. T.C.A. § 61-2-1204 provides in part:

> (c) Except as provided in subsection (e), a limited partnership formed prior to January 1, 1988 shall continue to be governed by chapter 2 of this title in effect prior to the adoption of chapter 2 of this title as hereby repealed, except that such limited partnership shall not have its term extended except under this chapter . . .
>
> (e) Any limited partnership formed prior to January 1, 1989, and any foreign limited partnership may elect to be governed by this chapter before July 1, 1989 by filing with the register of deeds prior to January 1, 1989 and with the secretary of state on or after January 1, 1989 a certificate of limited partnership, or an application for registration as a foreign limited partnership which complies with this chapter or a certificate of amendment which would cause its certificate of limited partnership to comply with this chapter and which specifically states that it is electing to be so bound and by paying the fee for a certificate of limited partnership specified in § 61-2-1207(a)(8). Such certificate may be filed by any general partner without the necessity of obtaining the approval of any limited partner.

In this case, there is no evidence that the Appellant made the necessary election to be governed by the Revised Act. The only evidence of an election is contained in the affidavit of an expert witness who stated that the appropriate documents were prepared for filing. There is, however, no evidence that the documents were actually filed or that any fees were paid in compliance with the statutory requirements. Thus, the trial court properly determined that the Uniform Act applies in this case.

The trial court determined that "the transfer by general partner Smith of the partnership asset at bar without the consent of all of the limited partners is null and void as a matter of law . . ." This issue was also resolved through summary judgment. The trial court noted that "the sale of the partnership property by the general partner violated both T.C.A. § 61-2-109 and the fiduciary duty of the general partner . . ."

4

Under the Uniform Act:

A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority:

(1) To do any action in contravention of the certificate;
(2) To do any act which would make it impossible to carry on the ordinary business of the partnership;
(3) To confess a judgment against the partnership;
(4) To possess partnership property, or assign their rights in a specific partnership property, for other than a partnership purpose;
(5) To admit a person as a general partner;
(6) To admit a person as a limited partner, unless the right to do so is given in the certificate; or
(7) To continue the business with partnership property on the death, retirement, or insanity of a general partner, unless the right to do so is given in the certificate.

T.C.A. § 61-2-109 (repealed 1988).

The Limited Partnership Agreement states that it is intended to comply with the Uniform Act and that any provision of the agreement that violates the Act is invalid. Section 8.3 (l) of the agreement states:

The General Partner, on behalf of the Partnership and in furtherance of the business of the Partnership, shall have the authority to perform all acts which the Partnership is authorized to perform, including, but not limited to, the following:
. . . (l) to refinance, sell or otherwise dispose of all or substantially all of the assets of the Partnership at any one time, subject to the provision of Article XI defining certain rights of the Limited Partners.

As the trial court noted, there is little Tennessee authority on this issue under the Uniform Act. The trial court therefore analyzed case law from other jurisdictions. The trial court relied heavily upon *Newburger, Loeb and Co., Inc. v. Gross*, 365 F.Supp. 1364 (S.D.N.Y. 1973), 563 F.2d 1057 (2nd Cir., 1977), *cert. denied,* 434 U.S. 1035 (1978), 611 F.2d 423 (2nd Cir. 1979). In *Newburger*, two of the limited partners did not consent to the transfer of partnership assets to a new

5

entity. The *Newburger* trial court, construing a statute identical to the former T.C.A. § 61-2-109 concluded that the general partners had violated their statutory and fiduciary duties. The trial court noted:

> It is undisputed that limited partners Bleich and Donoghue did not give their written consent to or thereafter ratify the Transfer Agreement. Plaintiff contends, however, that execution of the Transfer Agreement was not in violation of [the statute]. The Court, however, concludes that the execution of the Transfer Agreement without the written consent of the limited partners was in violation of the statute. Even if there were a contrary provision in the Partnership Articles, an issue which the Court need not and does not decide, such a provision would violate [the statute] and be invalid.

365 F.Supp at 1365.

The Second Circuit affirmed the portion of the opinion holding the transfer invalid, but also cited to *Mist Properties, Inc. v. Fitzsimmons Realty Co.*, 228 N.Y.S.2d 406 (N.Y.Sup.Ct. 1962). The Second Circuit noted:

> *Mist Properties* held that a transfer of the partnership property by general partners, without the consent of the limited partners, did not violate [the N.Y. Limited Partnership Act] where the partnership agreement 'specifically contemplated and provided for' the transfer that took place. Id. at 410. [The trial court] rejected the argument that the rights of limited partners under [the statute] could be abrogated by the partnership agreement . . . However, there is simply no language in the Partnership agreement that can be construed as granting the general partners the right to conduct [the transfer].

563 F.2d 1057, 1075.

Thus, the Second Circuit distinguished *Newburger* from *Mist.* In *Mist,* the limited partnership agreement stated that:

> The General Partners in their absolute discretion shall have the power on behalf of the Partnership (I) to sell and convey title to, and to grant an option for the sale of all or any portion of the Property, including any mortgage or leasehold interest or other property which may be acquired by the Partnership upon a transfer of the Property . . .

228 N.Y.S.2d at 409.

Interpreting this language, the court determined that "[t]here clearly

6

appears to have been no violation of the statute since the conveyance was not without the written consent of the limited partners but was specifically contemplated and provided for by the agreement." *Id.* at 410. The Massachusetts Appeals Court considered a similar issue in *Wasserman v. Wasserman*, 386 N.E.2d 783 (Mass.App.Ct. 1979). The court noted that "cases from other jurisdictions which have considered the question have either held or assumed that the required consent can be found in the express provisions of a partnership agreement." *Id.* at 787 (citations omitted). Similarly, the Arizona Court of Appeals held that "[t]he consent required by the statute can be found in the express provisions of the partnership agreement." *Jerman v. O'Leary,* 701 P.2d 1205, 1209 (Ariz.Ct.App. 1985)(citations omitted).

In this case, the Limited Partnership Agreement states that the general partner has authority "to refinance, sell or otherwise dispose of all or substantially all of the assets of the Partnership at any one time . . ." Under the rationale of *Mist,* this language could reasonably be interpreted as providing consent for the sale of the assets. Thus, this case is distinguishable from *Newburger,* where no such language existed in the partnership agreement. Although the Appellant could properly sell the assets, that does not necessarily mean that he could also purchase them. His purchase must also be analyzed in terms of his statutory and fiduciary duties.

The Appellant was not authorized to purchase the property at auction. Under the Uniform Act, a general partner may not possess partnership property for other than a partnership purpose without the consent or ratification of the limited partners. T.C.A. § 61-2-109 (repealed 1988). The Uniform Act requires "written consent or ratification of the specific act." *Id.* The Limited Partnership Agreement in this case does not specifically permit the general partner to possess partnership property for a non-partnership purpose. Although the Agreement grants very broad powers to the general partner, it is to be construed in accordance with the Uniform

7

Act. Since there is no specific grant of permission to purchase the partnership property, the Appellant was not authorized to do so. *Cf. Jerman v. O'Leary*, 701 P.2d 1205 (Ariz.Ct.App. 1985)(defendant did not possess partnership property without consent when partnership agreement stated that general partner could "acquire" partnership property). When reviewing documents that purportedly allow self dealing by a general partner "courts will not imply such a power, and even when it is expressly given they construe it so narrowly that it is seldom, if ever, found to exist in the matter under consideration." 59A Am.Jur.2d *Partnership* § 1291 (1987). The Appellant was not authorized to purchase the property.

The trial court determined that the Appellant had no authority to extend his base management fee beyond its original expiration date. The Contract for Management Services, executed between the limited partnership and the general partner on December 31, 1982, provides in part:

> 2 .<u>Compensation</u>. As full compensation for services rendered to the Partnership in whatever capacity rendered, the Partnership shall pay to Smith the sum of $545.07 per month payable within ten (10) days following the conclusion of the month. These payments shall be made for five (5) years, and such compensation shall not be paid for employment beyond that term. As additional compensation for the services rendered to the Partnership in whatever capacity rendered, the Partnership shall also pay to Smith, as an incentive for the effective management of the Partnership, fifty per cent (50%) of all cash income realized in excess of Forty-two Thousand Dollars ($42,000.00) per year generated from the rental and leasing of the Partnership property. This compensation shall be paid to Smith for any employment during any extension as provided in paragraph 3 of this Agreement.
> 3. <u>Term</u>. The term of employment shall be five (5) years from the date hereof unless further extended by agreement of all the parties . . .

The Appellant continued to pay either himself or his designee Virginia Abernathy (his wife) the $547.07 monthly fee after December 31, 1987. The Appellant memorialized his authority to extend the agreement in a document dated

March 7, 1990.  This document provides:

> The contract for management services between BIB Enterprises, Ltd., and Gregory Smith expired December 31, 1987. This extension agreement, per paragraph 3 of the Contract for Management Services, extends the Contract Term from the date of expiration, January 1, 1988 through a period ending five years from today's date, or until March 7, 1995.

This document is signed by Greg Smith as general partner of BIB Enterprises, Ltd., and by Gregory Smith individually.

The trial court correctly noted that "[t]he meaning of the contractual provisions relative to compensation of the general partner must be considered in light of the fiduciary duty of the general partner and the extraordinary powers of management given to him, both by the Uniform Limited Partnership Act and by the Limited Partnership Agreement in issue." The trial court found that the 1982 Contract for Management Services is not ambiguous. The interpretation of unambiguous contracts is a question of law for the court. *Hardeman County Bank v. Stallings*, 917 S.W.2d 695 (Tenn.App. 1995), *appeal denied*, (Jan. 29, 1996).

The Contract for Management Services clearly states that the $547.07 per month "shall be paid for five (5) years and such compensation shall not be paid for employment beyond that term." The contract also states that the 50% override "shall be paid to Smith for any employment during any extension as provided in paragraph 3 of this Agreement."  Thus, as the trial court properly found, "[i]t is clear that paragraph 3 can only extend the percentage override term. Otherwise, the five-year limitation on the Five Hundred Forty-five Dollars and Seven Cents ($545.07) per month payment would make no sense."

The Appellant contends that the Limited Partnership Agreement authorizes him to make contracts on behalf of the partnership and thus permits him to extend the compensation.  As noted previously, courts narrowly construe documents

9

that purportedly allow self dealing by a general partner  59A Am.Jur.2d *Partnership* § 1291 (1987).  The trial court did not err on this issue.

The Appellant contends that the trial court erred in holding that certain payments made by Southeast to BIB under an equipment lease-purchase agreement were not rental or leasing income and therefore not subject to the provision allowing the Appellant 50% of all annual rentals over $42,000.00.  According to the trial court "all parties construed the equipment disposition to Southeast as being the sale of an asset rather than a lease thereof, and the Court agrees that such construction by the parties is a correct interpretation of the contract."

Tennessee decisions have addressed the distinction between a true lease and a conditional sale.  In *United States Fidelity and Guar. Co. v. Thompson & Green Mach. Co., Inc.*, 568 S.W.2d 821, 825 (Tenn. 1978), the Tennessee Supreme Court stated:

> Perhaps the most revealing test is whether the so-called lessee is obligated to accept and pay for the property or is obligated only to return or account for the property according to the terms of the lease from which he may be excused only if he exercises his privilege of purchasing it. If the latter is the case the transaction is a true lease but if the contract, whatever its form, imposes an absolute obligation to pay for and accept the property and the transferor may require its return only upon default of the transferee, the transaction is a conditional sale.

(citations omitted).

The court also noted that "the intent of the parties is always controlling and is to be ascertained from the whole transaction, not merely from the language employed." Id.

In this case, the restaurant equipment transaction between BIB and Southeast is titled "Lease Agreement" and is separate from the lease of the restaurant itself. The original transaction between BIB and Dinero made no such distinction. The terms of the Southeast transaction state that it is a thirty month, non-cancelable lease requiring payments of $1698.30 per month plus sales tax.  It appears that the

10

only way BIB could repossess the equipment during this period was if Southeast defaulted. Paragraph four of the agreement provides "[a]t the expiration of the lease term, the Lessee shall have the option of purchasing the said equipment by paying the sum of Twelve Thousand Five Hundred Dollars ($12,500.00) to the Lessor. Until such price shall have been paid in full, the said equipment shall remain in the property of the Lessor."

> In *United States Fidelity,* the court noted:
>
> In close cases the courts consider whether the payments required of the transferee are in such amounts, spread over such a period of time, and are to be so made that compared with the original value of the property, its depreciation and likely value at the end of the term, that they may be reasonably considered as compensation *for the use* of the property or, instead, as payments on an absolute obligation *for the purchase price*, as in a conditional sale.

568 S.W.2d at 825.

Southeast's total payments, including sales tax, over thirty months amounted to approximately $54,705.30. Southeast could then exercise its option to purchase the equipment for $12,500.00. This low purchase price, compared to the amount of the monthly payments indicates that Southeast was making payments towards a purchase.

The trial court applied the rule of practical construction. Under this approach, "the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court . . ." *Hamblen County v. City of Morristown,* 656 S.W.2d 331, 335 (Tenn. 1983)(citations omitted). When applying this rule, "not only the acts but the declarations of the parties may be considered." *Id.* Additionally:

> In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into — not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement. *Appling v. Ellendale 122 Property*, 718 S.W.2d 261 (Tenn.App. 1986)(applying rules of construction to a limited partnership

agreement).

In this case, the record contains no direct evidence of how Southeast viewed the transaction. The trial court was correct, however in finding that the BIB partners viewed the transaction as a sale. In a memorandum written in preparation for litigation against Martin-Dinero for defaulting on the original lease and dated December 11, 1985, one of the BIB limited partners described the deal with Southeast:

> As I recall, for tax purposes we valued the equipment at $125,000 at the time of the original lease on December 31, 1982.
> The lease was breached and we threw Dinero off the property on December 31, 1984. We were forced to get a new tenant and the new tenant is Southeast Restaurants which is really a man named McKinney. McKinney would not lease the property from us unless he was permitted to buy the equipment from us. We were forced in order to quickly re-lease the property to sell him the equipment as of January 1, 1985 for $60,000 payable at the rate of $1,698.30 a month with an option to purchase at the end of the 30-month period of $12,500. I believe we calculated this as a total of $60,000 payable over the 30-month period with an extremely low interest rate--something like 5%.

Similarly, the Appellant testified by deposition in the same litigation. When asked about the equipment transaction he stated that Southeast was "purchasing the equipment under a lease purchase agreement . . ." Additionally, in a report to the limited partners dated January 9, 1985, the Appellant noted that the Dinero lease "had no separate provision for equipment, while the new agreement treats the equipment separately." He noted that under the new lease "the equipment is being sold, resulting in present cash flow for the partnership."

The Appellant's expert witness characterized the equipment transaction as a lease "[a]t least for tax and financial reporting purposes." The trial court found that "[t]he critical question to be answered is not under tax and accounting law, but under principles of contract construction applicable to the limited partnership

12

agreement in question." In *United States Fidelity*, the court stated that "[t]he accounting methods employed by each of the parties with respect to the rental payments . . . may be considered to be more indicative of the hope of the parties to minimize federal income taxes than of the true nature of the transactions between them." 568 S.W.2d at 826. Based on all the available evidence, the trial court did not err in characterizing the Southeast equipment transaction as a sale not subject to the 50% override.

The Appellant argues that the trial court erred in determining that payments made to BIB by the guarantors of the original Dinero lease were not subject to the 50% override provision. The trial court held that the payments were not "rent or lease" payments and were therefore "simply not subject to the 50% override." The trial court noted that "such payments were not considered by the managing partner himself to be subject to the override until after ill will developed among the parties."

The entire $25,000.00 settlement was distributed in accordance with paragraph 7.2 of the Partnership Agreement, which addresses cash distributions to the limited partners. The trial court found that the Appellant never asserted any right to the 50% override at that time. While some percentage of the total settlement could arguably comprise compensation for lost rent, the evidence does not show that it was treated that way by the parties. Thus, the trial court did not err on this issue.

The trial court also determined that an F.D.I.C. discount of the mortgage on the property was not income from leasing and rental. After the Bank of Loretto failed, the F.D.I.C. took it over and thus obtained the Dinero loan on which BIB was making monthly payments. The Appellant negotiated with the F.D.I.C. and was able to obtain a $45,000.00 discount on the note, which BIB purchased for $235,000.00. BIB obtained financing for the purchase through a bridge loan at Dominion Bank.

The Appellant contends that the $45,000.00 discount was subject to the

50% override provision. The trial court held that the discount "produces a reduction in debt for the partnership and is not 'lease or rental' income . . ." The trial court was correct in this determination. The Partnership Agreement provides for the 50% override for cash income "generated from the rental and leasing of the Partnership property." The F.D.I.C. discount does not fall under the terms of this provision and is therefore not subject to the 50% override.

The Appellant argues that the trial court erred in refusing to reduce his debt to the partnership by $27,054.65. This amount represents payments the Appellant made when he purchased the partnership property. The Appellant made a $24,250.00 down payment and paid $2,804.50 in closing costs. The trial court determined that he was not entitled to the offset since "the purported sale of the only asset of the limited partnership was null and void and in breach of his fiduciary duty." As noted previously, the Appellant was authorized to sell the partnership property. He could not, however, purchase it for himself.

The trial court properly voided the Appellant's purchase of the property. The Appellant should receive a credit, however, for the money that BIB received after the sale. Otherwise, the Appellees would receive a windfall because they would not only have the property, but would also retain the money paid by the Appellant. Exhibit 202 6-17-97, affixed to Vol. 18 of the Transcript, is an analysis of the offset. This analysis computes the total cash the Appellant paid and then deducts any settlement charges paid by either the buyer or seller as a result of the sale. This computation yields an offset of $27,054.65, which would reduce the Appellant's debt to the partnership to $26,462.12. The trial court erred in failing to make this offset.

The Appellant contends that the trial court erred in ordering the dissolution of the partnership and appointing a receiver. The Appellant argues that the Appellees waived the right to seek such relief in the Partnership Agreement. A court

14

has no authority to order dissolution absent an application by one of the parties. *Owens v. Bricks, Inc.*, 703 S.W.2d 147 (Tenn.App. 1985). In this case, the request was set forth in the Amended Complaint. "The terms of a partnership contract will not deprive a court of its equity jurisdiction to decree the dissolution of a partnership on proper grounds." 59A Am.Jur.2d *Partnership* §849 (1987); *See also Barclay v. Barrie,* 102 N.E. 602 (N.Y. 1913)(partnership agreement stating that there was no right to relief until a set period of time after notice of breach did not defeat right to seek judicial dissolution). The trial court properly ordered dissolution.

The Appellees argue that the trial court erred in refusing to find the Appellant's wife, Virginia Abernathy, liable for conversion. Conversion is "the appropriation of [property] to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right." *Mammoth Cave Prod. Credit Ass'n. v. Oldham,* 569 S.W.2d 833, 836 (Tenn.App. 1977) (citations omitted). The Appellees claim that Virginia Abernathy received funds through an agreement with the Appellant to receive part of his management fee. The trial court found that the Appellees were not entitled to a judgment against Virginia Abernathy and that the amount of money sought from her was included within the amount already adjudged against the Appellant. The trial court determined that the proof did not establish any basis for holding Abernathy liable. Based on the record, the trial court did not err on this issue.

The Appellees also argue that the trial court erred in refusing to award them attorney's fees, discretionary costs and prejudgment interest. Generally, attorney's fees are not recoverable "in the absence of a statute or contract specifically providing for such recovery, or a recognized ground of equity . . ." *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985). The Revised Uniform Limited Partnership Act provides for recovery of attorney's fees in derivative actions.

15

*See* T.C.A. § 61-2-1004. There is no provision under the Uniform Limited Partnership Act that seems applicable to this case. Tennessee cases have allowed attorney's fee awards for breaches of a trustee's fiduciary duty. *Brown v. Conroy,* 1990 WL 10574 (Tenn.App.); *See also Marshall v. First Nat. Bank of Lewisburg*, 622 S.W.2d 558 (Tenn.App. 1981)(recognizing appropriateness of such an award). Regardless, the trial court properly noted that under the facts of this particular case attorney's fees should not be awarded. The trial court did not err on this issue.

An award of prejudgment interest is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992). In *Mitchell v. Mitchell*, 876 S.W.2d 830, 832, (Tenn. 1994) the Supreme Court noted that prejudgment interest would be allowed when "the amount of the obligation is certain, or can be ascertained by a proper accounting, and the obligation is not disputed on reasonable grounds. . ." In this case, there was considerable controversy over the amount due. The trial court did not abuse its discretion. The same standard of review governs the awarding of discretionary costs. Tenn.R.Civ.P. 54.04(2). Based on the record, the trial court also did not abuse its discretion on this issue.

We affirm the judgment of the Trial Court, as modified herein. The cause is remanded for entry of judgment in conformity with this Opinion. The cost of the cause is adjudged one-half to the appellants and one-half to the appellees.

_____

_____
Herschel P. Franks, J.

CONCUR:

_____
Houston M. Goddard, P.J.


_____
Don T. McMurray, J.