IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2002 Session

## RAY C. HALL, ET AL. v. TENNESSEE WORKERS CREDIT UNION

Appeal from the Chancery Court for Davidson County
No. 98-3798-III     Ellen Hobbs Lyle, Chancellor

No. M2001-01346-COA-R3-CV - Filed December 5, 2002

Husband and Wife obtained a loan from a credit union and pledged their home as security for the note under a Deed of Trust. The Deed of Trust required Husband and Wife to maintain property taxes and insurance on the property. The credit union foreclosed on the property after Husband and Wife continuously failed to maintain the taxes and insurance. Husband and Wife filed suit against the credit union, arguing that the agreement between the parties did not provide the remedy of foreclosure for mere nonpayment of taxes and insurance. The trial court granted summary judgment for the credit union. Because we find that the agreement between the parties provides the remedy of foreclosure for breach of any promise made under the agreement, including the promise to pay property taxes and insurance, we find that the trial court was correct in granting summary judgment for the credit union and affirm that decision.

**Tenn. R. App. P. 3 Appeal as of Right: Judgment of the Chancery Court
Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN, J. and VERNON NEAL, SP. J., joined.

Harry W. Miller, III, Nashville, Tennessee, for the appellants, Ray C. Hall and Jacqueline S. Hall.

L. Gino Marchetti, Jr., A. Allen Smith, III, Nashville, Tennessee, for the appellee, Tennessee Workers Credit Union.

### OPINION

Ray and Jaqueline Hall ("Halls"), the debtors, sued their creditor, Tennessee Workers Credit Union ("TWCU"), because TWCU foreclosed on the debtors' house. The complaint alleged the foreclosure was improper and made in bad faith because it was in breach of the Deed of Trust. TWCU foreclosed on the property covered by the Deed of Trust because of the debtors' repeated and continuing failure to maintain insurance on the house and to pay taxes on it, both of which were obligations set out in the Deed of Trust.

The debtors' argument is that the Deed of Trust did not authorize acceleration of the loan amounts due, a declaration of default, or foreclosure for failure to maintain insurance and pay taxes on the property. The trial court granted summary judgment to TWCU and considered other documents which TWCU contends are part of the financial arrangement between it and the debtors. The debtors argue that the trial court could not have considered documents outside the Deed of Trust.

The facts are undisputed. In March of 1989, the Halls obtained a loan from TWCU for approximately Sixty Thousand Dollars ($60,000.00). Their personal residence at One Breckenridge was pledged as security for performance of their contractual obligations. The loan was secured by a Deed of Trust which was duly recorded. The Halls signed various documents during the initial loan application process. In addition, other documents had been executed by Mr. Hall a number of years earlier when the relationship with the credit union was established.

The Halls made an arrangement with TWCU wherein the mortgage amounts would be deducted semi-monthly from their checking account in the amount of $432.50. The Deed of Trust required the Halls to keep insurance on the property and to pay all taxes and assessments when due. In the event that the Halls failed to fulfill these requirements, the Deed of Trust allowed TWCU to secure insurance and/or pay taxes and assessments and charge the Halls for the amount expended as part of the debt.

The Halls, by their own admissions, failed to maintain insurance and pay taxes on the property. They did not pay their county property taxes for 1992 and 1993, which resulted in liens on the property in the amounts of $5,725.43 and $7,004.34.[1] As a consequence of their failure to pay taxes, the house was sold in 1994, but the Halls were able to redeem or repurchase the home.[2]

Because of the Halls' failure to pay taxes, TWCU determined that the Halls were in default. On September 27, 1994, TWCU Trustee Paul White met with Mr. Hall,[3] and the parties discussed options in lieu of foreclosure. Mr. Hall assured TWCU that he would be receiving a substantial distribution from the estate of Hobart Hall that would permit him to extinguish the debt owed to TWCU. Mr. White sent Mr. Hall a letter confirming the agreements reached at the meeting: in exchange for TWCU's commitment to stay foreclosure, the Halls agreed to do several things: (1) provide a copy of the recorded release of the federal tax lien; (2) provide proof of insurance for all automobiles currently financed through TWCU; (3) provide evidence of payment of delinquent property taxes; (4) provide a confirmation of the tax sale on the Breckenridge property; (5) provide

[1] There was apparently also a federal tax lien on the property in the amount of $27,165.15.

[2] The 1994 sale of the home is not at issue in this case. In addition, in 1990 and 1991, the Halls executed two additional Deeds of Trust on the property to Sovran Bank in amounts of $60,000.00 and $10,000.00. That bank had a lien on the property at the time of the foreclosure and was paid with the proceeds of the foreclosure sale.

[3] In their briefs, the parties appear to take differing positions on whether Mrs. Hall attended the meeting. The record supports the Halls' position that only Mr. Hall attended the meeting. Determination of this factual question, however, is not necessary to the resolution of the appeal.

a letter from attorney Gary Temple regarding the amount of Mr. Hall's share in the estate of Hobart Hall; and, (6) keep insurance on the residence and retire all debts with TWCU upon receipt of Mr. Hall's distribution from the estate. October 15, 1994, was set as the date for compliance.

On March 20, 1995, and April 21, 1995, Mr. White again wrote to Mr. Hall regarding the Halls' failure to fulfill all of the commitments made at the September meeting. TWCU received no response to either of these letters. TWCU then contacted attorney Gary Temple to inquire about the distribution of Hobart Hall's estate and learned that no distribution to Ray Hall would be made in the near future. During this time, the 1994 and 1995 county property taxes went unpaid.

On May 1, 1995, Mr. White wrote to Mr. Hall providing notice that TWCU intended to begin foreclosure proceedings on May 31, 1995. The day the foreclosure proceedings were to begin, Mr. Hall wrote to TWCU CEO, Kenneth Wiggins, asking for time to sell the property at One Breckenridge in order to satisfy the debt owed to TWCU and conceding that the 1995 property taxes were not paid.

On June 9, 1995, Mr. White wrote a letter to Mr. Hall. The letter set ninety (90) days as a deadline to either produce a contract of sale or refinance the home. The letter contained an acknowledgment for Mr. Hall to sign and return to TWCU. The acknowledgment was executed by Mr. Hall and returned to TWCU on June 18, 1995. At some point, the Halls listed their home with a real estate agent for a list price in excess of $800,000.00.

In late August 1995, TWCU learned that the insurance on the property was set to expire on September 9, 1995. Upon learning this information, Mr. White wrote a letter to Mr. Hall on August 30, 1995, notifying him of the impending breach of the agreement for failure to maintain insurance on the property. The Halls did not respond to this letter. On September 13, 1995, Mr. White again wrote a letter to Mr. Hall notifying him of the default for failure to maintain insurance on the property. TWCU began the foreclosure process at that time.

On December 4, 1995, the property at One Breckenridge was sold at a foreclosure sale for $425,000.00. At the time of the foreclosure, the 1994 and 1995 taxes were overdue and the 1995 insurance on the property had not been paid. The balance on the TWCU mortgage was $29,966.37. After satisfaction of their debts, the Halls were issued a check for the proceeds of the sale in the amount of $290,783.46. The Halls were current on their loan payments to TWCU. The last payment was deducted from their bank account on November 30, 1995, just a few days prior to the foreclosure sale.

The Halls filed suit against TWCU in December of 1995. The original complaint alleged breach of contract, bad faith, breach of fiduciary duty, and outrageous conduct. The Halls voluntarily non-suited their complaint after the trial court denied a petition for a temporary injunction.

The Halls filed a second verified complaint in Davidson County Chancery Court on December 28, 1998, against TWCU. The Halls' claims were based on the foreclosure and subsequent sale of their property by TWCU in 1995.

TWCU and the Halls both filed motions for summary judgment with the trial court. After a hearing, the trial court granted TWCU's motion for summary judgment and issued a final order on July 9, 2001, awarding $9,022.32 in attorney's fees and costs to TWCU based on the terms of the contract between the parties. The Halls appeal that judgment.

In ruling on the motion for summary judgment, the trial court concluded that there was no genuine issue of material fact and that as a matter of law TWCU did not breach the parties' contract. The trial court additionally concluded that: (1) the parties' contract permitted foreclosure for nonpayment of taxes and insurance; and, (2) Mr. Hall conceded that he was in default, assented to acceleration, and made an agreement with TWCU that he would pay off his obligation or submit to foreclosure.

## I. Standard of Review

The standards for reviewing summary judgments on appeal are well settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Church v. Perales*, 39 S.W.3d 149, 156 (Tenn. Ct. App. 2000). However, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion - that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Goodloe v. State,* 36 S.W.3d 62, 65 (Tenn. 2001).

Because summary judgment involves only questions of law or the application of the law to certain facts, summary judgments enjoy no presumption of correctness on appeal. *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 285 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). This court's role in review of the grant of summary judgment is to review the record and determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 88 (Tenn. 2000). Our perspective is the same as that of the trial court. *Gonzales v. Alman Const. Co.*, 857 S.W.2d 42, 44-45 (Tenn. Ct. App. 1993).

There are no material facts in dispute in this case, and the question is purely one of law. Questions relating to the interpretation of written contracts involve legal rather than factual issues, *Brandt v. Bib Enters., Ltd.*, 986 S.W.2d 586, 592 (Tenn. Ct. App. 1998); *Rapp Constr. Co. v. Jay Realty Co.*, 809 S.W.2d 490, 491 (Tenn. Ct. App. 1991); *Woodmen of the World Life Ins. Soc'y v.*

*Bank of Waynesboro*, 826 S.W.2d 915, 918 (Tenn. Ct. App. 1991) (citing 88 C.J.S. Trial § 217 (1955)), and the court's role is to interpret the contract according to its plain terms. *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995) (citing *Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975); *Malone & Hyde Food Serv. v. Parson*, 642 S.W.2d 157, 159 (Tenn. Ct. App. 1982)); *Estate of Haynes v. Braden*, 835 S.W.2d 19, 21 (Tenn. Ct. App. 1992) (citations omitted).

The courts' task in resolving contract disputes is to ascertain the intent of the parties based upon the language of the agreement. *Guilliano v. Cleo, Inc.* 995 S.W.2d 88, 95 (Tenn. 1999). This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and the legal effect of those words requires no resolution of a factual dispute. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002).

## II. The Documents

Although the parties do not explicitly or entirely concede the point, our interpretation of their arguments is that the answer to the question of whether TWCU had a right to foreclose depends upon which documents are considered part of the agreement between the parties. We agree.

In granting summary judgment for TWCU, the trial court stated:

> The Court concludes that the parties' contract does permit foreclosure for nonpayment of taxes and insurance. In arriving at this conclusion the Court has considered the parties' contract to consist of not only the Deed of Trust but the credit agreement and the Loanliner application. When the provisions of those documents are read together, the Court concludes that the defendant [TWCU] was entitled to foreclose for nonpayment of taxes and insurance.

The Halls contend that only the Deed of Trust and the Deed of Trust Note constitute the mortgage contract or the agreement of the parties. TWCU, on the other hand, asserts that the written agreement between the parties includes other documents, specifically the two other documents referenced by the trial court. The record contains a series of documents, which we will examine individually.

### A. The Credit Agreement and Truth-in-Lending Disclosures

On June 12, 1981, Mr. Hall signed a document titled "Credit Agreement and Truth-in-Lending Disclosures" with TWCU.[4] This document essentially establishes the terms and conditions

---

[4] Mrs. Hall did not sign this document.

of the relationship between the parties and of any future transactions.[5] The terms set out in the document are referred to as "the Plan" and specify that "each person who signs the Plan is responsible for any advances made under it. . . ." In pertinent part, the document also states:

> After the credit union has approved your Loanliner Credit application, the credit union may lend you money from time to time. You promise to repay, to the credit union, all money loaned to you under this Plan . . . .

The document describes the computation methods for finances charges, minimum payments, and payment allocation. The Plan's provision on default provides:

> You are in default if you are late in making any minimum payment, if you break any promise you made under this Plan, or if anyone garnishes your share and/or deposit account. You are also in default if you break any promise you made under a Security Agreement for an advance. When you are in default: The credit union may require immediate payment of all you owe. That means you will have to pay your entire unpaid balance plus any FINANCE CHARGE earned. The credit union need not notify you that immediate payment is being required unless state law requires notice to be given. State or federal law gives the credit union a lien on all present and future shares and the right to freeze in your share and/or deposit account(s) the amount you are in default. You are not permitted to withdraw money that is frozen in your account(s). You authorize the credit union to use the money you gave as security under the paragraph "Pledge of Shares" to pay off what you owe.

By the terms of the Credit Agreement and Truth in Lending Disclosures, TWCU is given the right to accelerate payment of any amount due when the debtor is in default. Default includes "breaking any promise made under this Plan" as well as any promise "made under a Security Agreement for an advance." We note again that the Plan includes a requirement of insurance on tangible property.

### B. Loanliner Credit Application for First Mortgage

The mortgage which is the subject of this lawsuit began with an application. Mr. and Mrs. Hall applied for joint credit from TWCU in March of 1989 by requesting an advance of $50,000 for a first mortgage on the property located at One Breckenridge. The application was signed by Mr. and Mrs. Hall. Mr. Hall signed as "applicant" and Mrs. Hall did not check the box as to whether she signed as "co-applicant" or "guarantor."

This credit application, specifically for the mortgage at issue, stated "You apply for credit under the terms disclosed in the Loanliner Credit Agreement and Truth-in-Lending Disclosures."

---

[5]From the record, we were able to ascertain that the Halls procured several loans from TWCU from 1981 onward, including two (2) automobile loans and the mortgage at issue in the case herein.

Thus, the credit application specifically incorporated the terms and conditions set out in the credit agreement previously signed by Mr. Hall. This conclusion is unavoidable due to the language of the application. We also note that the earlier agreement was intended to establish terms and conditions for all future transactions between the parties. Although Mrs. Hall did not sign the original credit agreement, she signed the Loanliner Credit Application for the mortgage and agreed, therefore, that the loan would be subject to the terms in the credit agreement.

## C. Deed of Trust

The Deed of Trust was signed March 14, 1989 by Mr. and Mrs. Hall. The stated purpose of the Deed of Trust was to:

> secure the payment of one note of even date herewith in the original principal monthly installments of $432.50 each, the first of which is due and payable on the 16th day of April, 1989, and thereafter. . . .

The Deed of Trust further stated:

> If we fail to pay the said sum of money when due as aforesaid, or any part of said sum, according to the terms above expressed, then all of the indebtedness hereby secured shall, at the option of the owner thereof, and without notice, become immediately due and payable, and upon such default . . . the said Trustee . . . is hereby authorized and empowered . . . to sell said property at the Court house door . . . to the highest bidder . . . . And we agree to keep all the buildings on said property insured in some reliable fire insurance company . . . for the sum of insurable value until the sum herein secured is fully paid, . . . and to pay all taxes and assessments, and to pay them when due; and in case we fail to do either; then said Trustee, or the creditor herein secured, may do either, and charge and treat the amount so expended as a part or the debt herein secured.

The Deed of Trust, therefore, requires the Halls to maintain insurance and pay taxes on the property pledged as security for the mortgage. They admit that they failed to pay the insurance and taxes on the property.

The Halls assert that the Deed of Trust did not give TWCU the right to accelerate payment or foreclose for failure to pay taxes or maintain insurance. They assert the Deed of Trust only gave TWCU the option to obtain insurance and pay the taxes on the property and then charge that amount to the principal owed by the Halls under the note.

## D. Note

The note was signed on March 14, 1989, by Mr. and Mrs. Hall. The note refers internally to the Deed of Trust, which is the "instrument securing this note." The note states:

Demand, notice and protest are expressly waived; and if not paid in full at the time and in the manner above specified, then all principal and accrued interest shall, at the option of the legal holder hereof, become at once due and payable without notice, . . . .

The note provides for acceleration as a result of default for failure to pay principal and interest and does not specifically grant that right for failure to pay insurance and taxes. The Halls were not in default on the principal and interest payments.

### E. Truth in Lending Disclosure Statement of 1989

The Truth-in-Lending Disclosure Statement signed March 14, 1989 lists Mr. Hall and Wife as borrowers of Sixty Thousand Dollars ($60,000.00)[6] and states that the interest rate is 12% and that 240 payments in the amount of $432.50 will be made beginning on April 16, 1989, and due on the 1st and 16th. The document states that "this obligation has a demand feature" and in the section entitled property insurance states: "I may obtain property insurance from anyone I want that is acceptable to the credit union. If I get the insurance from the credit union, I will pay $ _____." In the blank space on the form, the words "See DOT [Deed of Trust]" are handwritten. The security section and the late charge section of the Truth-in-Lending Statement also refer to the DOT.

The Truth-in-Lending Disclosure Statement also reads: "See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties." The Truth-in-Lending Disclosure Statement was signed by both Mr. and Mrs. Hall. The Truth-in-Lending Disclosure Statement explicitly references all other "contract documents."

### III. The Agreement Between the Parties

The terms of separate agreements forming integral parts of a single transaction may be considered together. Where several documents are integral parts of the same transaction, we will construe each of them in light of the other documents memorializing the transaction. *McCall v. Towne Square, Inc*. 503 S.W.2d 180, 182-83 (Tenn. 1973); *Oman Constr. Co. v. Tennessee Cent. Ry.*, 212 Tenn. 556, 573-74, 370 S.W.2d 563, 570-71 (1963); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 599 (Tenn. Ct. App. 1999); *Stovall v. Dattel*, 619 S.W.2d 125, 127 (Tenn. Ct. App. 1981).[7] In addition, the Tennessee Supreme Court has adopted the

---

[6]There is no explanation in the record for the difference between the Fifty Thousand Dollars ($50,000) requested on the Loanliner Credit Application and the Sixty Thousand Dollars ($60,000) on the Deed of Trust and the Truth-in-Lending Disclosure given the Halls in 1989. Neither party, however, disputes the amount of the loan on appeal.

[7]Further, it is a general rule of construction that a deed of trust and a note secured by it are deemed to be parts of one transaction and are to be construed together as such, with the intention of the parties to be determined from an examination of both unless there is an irreconcilable difference between the two documents. *Fergeson v. Peoples Nat'l*

(continued...)

following statement regarding the question of construing separate instruments together to establish the total contract:

> Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by reference as a part of the contract and therefore, may be properly considered in the construction of the contract. Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties.

*McCall*, 503 S.W.2d at 180.

Therefore, courts may consider several documents together in order to define the agreement between the parties, even if those documents are not signed at the same time, if those documents are integral to the transaction.

> In many instances, however, the terms of agreement may be expressed in two or more separate documents, some of these containing promises and statements as to consideration, and others, such as deeds, mortgages and trust indentures, embodying performances agreed upon rather than a statement of terms to be performed. In every such case, these documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others.
>
> The Restatement (Second) of Contracts, after declaring, "A writing is interpreted as a whole," adds in the same sentence, "and all writings that are part of the same transaction are interpreted together."
>
> . . . .
>
> Of course, additional documents and other circumstances should also be used in this process [determining the agreement between the parties], so far as they are relevant to the issue, even though they are not included within the boundaries of a single transaction.
>
> Internal references in one document to another are often helpful in the processes of interpretation and adjudication, but the absence of such a reference does not make a document unusable in these processes or inadmissible in evidence.
>
> . . . .

---

[7](...continued)
*Bank*, 800 S.W.2d 181, 183 (Tenn. 1990).

neither an accurate interpretation nor a just determination of legal effects [of a contract] can be reached without giving due consideration to all the parts of a contract and to all the elements of the transaction of which the contract is a part . . . .

MARGARET N. KNIFFIN, 5 CORBIN ON CONTRACTS, § 24.21 (Joseph M. Perillo, ed., rev. ed. 1998).

Under these principles, we find that the entire agreement between the parties is reflected in a series of documents starting with the 1981 credit agreement. The continuing relationship between the Halls and TWCU began with that document, and it establishes the terms and conditions for future loans. The initial Credit Agreement and Truth-in Lending Disclosures was a standard document used by TWCU and its members to evidence their agreement regarding their future dealings. The Loanliner Credit Application signed by both Halls was specific to the loan secured by their house and was certainly integral to that transaction. That document specifically incorporates the earlier credit agreement. By signing the application, the Halls acknowledged that the loan would be subject to the terms of the credit agreement and agreed to those terms.

Having defined the scope of the parties' agreement, TWCU's right to foreclose for the Halls' failure to pay taxes and maintain insurance on the property is determined by the language of that agreement. The cardinal rule for interpreting contracts is to ascertain the intention of the parties, and to give effect to that intention, consistent with legal principles. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). The parties' intention is found in the language of the agreement, and the words within the contract must be given their usual, natural and ordinary meaning. *Guiliano*, 995 S.W.2d at 95; *American Nat'l Prop. & Cas. Co. v. Gray*, 803 S.W.2d 693, 696 (Tenn. Ct. App. 1990). The rights and obligations of the parties to a written contract are governed by the terms of the contract, *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). Thus, a court's role is to enforce an unambiguous contract as it is written unless the contract is being challenged based on fraud or mistake. *Wills & Wills, L.P. v. Gill*, 54 S.W.3d 283, 286 (Tenn. Ct. App. 2001).

The initial credit agreement provides that the loan may be accelerated for default, which includes the breaking of any promise made in that agreement or in any specific security agreement for a future loan. The credit agreement includes a promise to maintain insurance on tangible property used to secure a loan. In addition, the Deed of Trust securing the loan at issue requires the Halls to maintain insurance and to pay taxes on the house. Consequently, we interpret the entire agreement of the parties as authorizing TWCU to accelerate the loan herein and foreclose on property securing that loan if the insurance and taxes provisions were breached. It is undisputed they were breached.

We also agree with the trial court's conclusions regarding the interpretation of the agreement to the effect that:

Under the default provisions the credit union is entitled, without advance notice, to require immediate payment of any outstanding loan balance and take possession of

the property.  The agreement entitles the credit union, once it has possession of the property, to sell it and apply the money received to any amounts owed to the credit union.

## IV.  Other Claims

The trial court also found that TWCU acted properly when it held the Halls in default and met with Mr. Hall in September of 1994 to determine how the default should be handled.  Based upon the parties correspondence after that meeting, the trial court found that Mr. Hall "conceded that he was in default, assented to acceleration and made an agreement with the defendant that plaintiff Hall would pay off the obligation or submit to foreclosure."  As the trial court found, the June 9, 1995 correspondence established that Mr. Hall agreed that TWCU would continue to deduct mortgage payments from his account because the letter stated, "you should be further advised that either of those 90 day options presupposes that you will keep the installment payments current on this loan as you have done in the immediate past."

On appeal, the Halls make several arguments about the correspondence between them and TWCU.  First, they argue that the correspondence did not modify or amend the agreement between the parties so as to create a right to foreclosure which did not exist in the original agreement, which the Halls assert consists only of the Deed of Trust and Note.  We have determined that the entire agreement between the parties includes other documents and that the right to foreclose for failure to pay taxes or maintain insurance is established in that agreement.

The Halls also assert they were not given notice of acceleration of the debt secured by the Deed of Trust.  They describe the correspondence after the September 1994 meeting as forbearance agreements.  The also assert that even if TWCU gave notice of acceleration, the acceleration was undone by TWCU's actions in accepting, actually withdrawing from the Halls' account, principal and interest payments.  The Halls assert that because TWCU continued to accept payments until a few days before the foreclosure, TWCU was obligated to continue to accept payments and not foreclose.

The agreement between the parties allows TWCU to "require immediate payment of all you owe" in the event of default.  Acceleration clauses are generally valid and will by enforced according to their terms.  *See Lively v. Drake*, 329 S.W.2d 900, 904 (Tenn. 1982).  The record demonstrates that the Halls were given notice of TWCU's acceleration of the payments due under the loan.  The September 27, 1994, letter sets out conditions, agreed to at the meeting, for waiving the default and reinstating the installment loan payments.  The letter concludes that if the conditions were not met, proceedings would be instituted to foreclose.  By letter dated June 9, 1995, after Mr. Hall's request for additional time to "sell the house and pay off the mortgage held by the TWCU," he was informed that he had ninety (90) days to pay the mortgage in full by either selling or refinancing the house or else TWCU would proceed with foreclosure.  Mr. Hall signed the acknowledgment on that letter whereby he indicated "acceptance of the additional ninety (90) day extension afforded by the

Tennessee Workers Credit Union for payment in full on this mortgage." Thus, we conclude that the Halls were well aware that TWCU had accelerated the loan and that the total amount was due.

With regard to the Halls' argument that TWCU's continued acceptance of regular monthly payments constituted waiver of the default, we conclude TWCU did not waive its right to proceed upon the Halls' default. Acceptance of a partial payment after default does not generally preclude foreclosure. *Lively*, 629 S.W.2d at 904. As the trial court found, TWCU granted the Halls additional time to pay their full indebtedness, but an express condition of these extensions was that the Halls continue making regular payments on the principal and interest. There is nothing about the course of dealing between the parties or their express agreement which would justify a departure from the general rule that partial payments do not constitute a waiver of default.

The Halls also made claims of bad faith, stating that TWCU should have exercised its option to pay the taxes and insurance and add that amount to the Halls' indebtedness. The Halls assert that TWCU, instead, made a deliberate decision to proceed with acceleration and foreclosure and, in so doing, breached the Deed of Trust. Given the fact that TWCU had the right to foreclose, and given the lengthy efforts of TWCU to seek the Halls' voluntary compliance with the terms of the agreements and its extensions of time for the Halls to secure other financing or sell the house, we agree with the trial court that there was no evidence of breach of contract, outrageous conduct, breach of fiduciary duty, or bad faith.

## V. Attorney's Fees and Costs

Finally, the Halls contest the award of attorney's fees and costs to TWCU by the trial court which found that the parties' agreement required the Halls to pay "all expenses and costs, including reasonable attorney's fees, incident to collection, or enforcement or protection of any rights pertaining to or growing out of the instruments securing this note."[8] The Halls argue that because TWCU breached its agreement with the Halls and acted in bad faith by wrongfully foreclosing on the house, "it cannot reasonably be argued that the Appellee is entitled to attorney's fees and costs to defend itself in litigation spawned by its wrongful acts." We have previously determined that the TWCU acted consistently with the agreement and not in bad faith. Consequently, the factual predicate of the Halls objection to attorney's fees is inaccurate. We affirm the portion of the trial court's decision ordering the Halls to pay $30.32 in expenses and $8,992.00 in attorney's fees to TWCU.

---

[8]In determining that the Halls were required to pay the attorney's fees, the trial court quoted the language from the Note signed on March 14, 1989, by Mr. and Mrs. Hall.

## VI. Conclusion

After a thorough review of the record, we affirm the trial court's decision granting summary judgment for TWCU. Costs of the appeal are taxed to the Halls, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE