Jesse G. APPLING, Jr., and Margaret Appling Klare, Plaintiffs,

v.

ELLENDALE 122 PROPERTY, a Tennessee Limited Partnership, and Almacar Company, a Tennessee General Partnership, consisting of Gary Albertine, Charlie McCrory, and Arnold Prather, Defendants and Third Party Plaintiffs, Appellants,

v.

William ST. ANDREWS, Van N. Arnold, Martha G. Barber, J. Louie Freeman, Jay Freeman, H.S. Humphreys and Peggy J. Humphreys, Felix A. Hughes, Jr., Thomas D. Irvin, C.C. Kennon, William P. Miller, Laura Clare Holt Parks, C.H. Springer, Granville Taylor, and Christopher Vincent, Third-Party Defendants, Appellees.

Court of Appeals of Tennessee, Western Section, at Jackson.

Feb. 12, 1986.

Application for Permission to Appeal Denied by Supreme Court Sept. 29, 1986.

Catherine H. Skefos and G. Patrick Arnoult, Memphis, for plaintiffs.

Jerry E. Mitchell, of Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams, Memphis, for defendants and third party plaintiffs, appellants.

E. Woods Weathersby and Frank N. Carney, of Evans, Petree, Cobb & Edwards, Michael E. Hewgley, Michael S. Champlin and Catherine H. Skefos, of Apperson, Crump, Duzene & Maxwell, Memphis, for third-party defendants, appellees.

TOMLIN, Judge.

This litigation is derived from a suit brought in the Chancery Court of Shelby County seeking a deficiency judgment, arising out of a foreclosure of a deed of trust on real estate in Shelby County. Ellendale 122 Property (hereafter "Ellendale") is a limited partnership. The Almacar Company (hereafter "Almacar") is the general partner of that partnership. The original plaintiffs, holders of the note and trust deed, sued Almacar, its partners, and Ellendale for the deficiency resulting from the foreclosure. Almacar and Ellendale filed a third-party complaint against the fifteen limited partners of Ellendale, seeking to recover from each of them a proportionate share of whatever judgment that might be awarded plaintiffs in the original action. Most, if not all, of the limited partners filed counter-claims against Ellendale and Almacar. Ellendale filed a motion for partial summary judgment, which motion was supported by an affidavit of one of the partners of Almacar. All third-party defendants also filed a motion for summary judgment. No supporting affidavits were filed, the movants stating that they were relying upon the provisions of the certificate of limited partnership (the partnership agreement) of Ellendale, which, along with the prospectus on Ellendale issued by Almacar, was admitted into evidence by stipulation of the parties.

The chancellor denied Ellendale's motion for partial summary judgment, and at the same time granted the motion for summary judgment on behalf of all third-party defendants. The case then proceeded to trial on the original complaint and answer. Counsel for all parties were allowed to participate. Judgment was rendered in favor of the original plaintiffs against Ellendale and Almacar for a deficiency found by the court to be in the amount of $108,210.07, plus attorney fees. This judgment has since been paid by Almacar. Ellendale and Almacar have appealed. In their brief they stated the issue as follows:

> Whether under Tennessee law and the Partnership Agreement the limited partners (third-party defendants) are liable to the partnership and the general partner (third-party plaintiffs) for pro rata contributions toward the amount of principal and interest paid by the general partner on behalf of the partnership to satisfy a deficiency judgment against the third-party plaintiffs which resulted from a foreclosure of the real estate which was the subject matter of the limited partnership.

For the reasons stated herein, we reverse the chancellor.

The facts leading up to this controversy are not in dispute. Almacar, a general partnership composed of three experienced real estate developers and investors, organized Ellendale, a limited partnership, for the purpose of taking title to some 126 acres of land in the community of Ellendale in northeast Shelby County. The land con-

templated for purchase and later bought by Ellendale was raw land and was bought for the sole purpose of real estate speculation. Almacar first offered for sale to prospective limited partners fifteen shares in Ellendale, the limited partnership. In this connection, Almacar caused a prospectus to be prepared and exhibited to prospective limited partners. The purpose of this investment is found at the top of page 5 of the prospectus.

It is the intention of the General Partner (ALMACAR COMPANY) to retain ownership of this tract of land in the Limited Partnership until such time as, in the opinion and sole discretion of the General Partner, the resale of the property would yield the highest profit to the investors. Such sale date obviously cannot be pre-selected because of the many variables that cause market conditions to change.

The face of the prospectus, dated July 10, 1974, states that the offering price to the public was $5,874.88 per unit. The fifteen units were purchased by fourteen individuals, with one limited partner purchasing two shares. Almacar, by and through each of its three partners, and all the limited partners entered into the partnership agreement, which was dated September 13, 1974, although the notarial acknowledgments indicate that the limited partners signed the agreement on July 31, 1974.

While there is absent from the record a copy of the deed from the original plaintiffs in Ellendale, on July 31, 1974, Ellendale, as a limited partnership, by and through the three partners of Almacar, executed two promissory notes to the co-owners of the property, each in the amount of $161,189.33, providing for interest-only payments annually at the rate of seven percent on the anniversary date of the note, with the principal and the eighth year's interest due on July 31, 1982. These notes were secured by a trust deed of the same date, executed by Ellendale, through Almacar.

According to the affidavit filed by one of the partners of Almacar, the prospectus furnished to each of the limited partners set forth their fiscal responsibilities. This affidavit recites that the prospectus states that the balance owing on the property, after the making of a 15 percent down payment, was to be carried by a promissory note for eight years, bearing interest at seven percent *per annum,* and that each of the limited partners was to pay one-fifteenth of the amount of the interest, plus a like *pro rata* share of the property taxes each year. This same affidavit, unchallenged and uncontradicted by the limited partners, recited that these *pro rata* interest/tax payments were made by the limited partners in 1975, 1976, and 1977, and that in 1978, while some refused to make their contributions, the interest payment for that year was made by the remaining limited partners. The affidavit then recited that "[i]n 1979, however, sufficient contributions were not forthcoming from the limited partners to pay the interest, and the property was foreclosed."

Both sides of this lawsuit rely heavily upon certain provisions of the partnership agreement, the Tennessee Uniform Limited Partnership Act, and the prospectus. The material provisions repeatedly referred to in the partnership agreement are as follows:

## ARTICLE V

## PARTNERSHIP INTERESTS AND CAPITAL CONTRIBUTIONS

. . . .

5.3 ADDITIONAL EXPENSES. As funds are needed for payment of reductions of principal and interest on such debt of the PARTNERSHIP and real estate ad valorem taxes and assessments with respect to PARTNERSHIP assets, and for no other purposes, and such funds are not available to the PARTNERSHIP, each PARTNER shall, upon the demand by the GENERAL PARTNER, made (sic) an additional cash contribution for his proportionate share of such expenses. In the event any PART-

NER fails to make such contribution within thirty (30) days after demand by the GENERAL PARTNER, then at the election of the PARTNERS who own the majority in interest in the capital account of the PARTNERSHIP as the same then exists:

(a) Such amount shall bear interest at the rate of eight per cent (8%) per annum until paid and the GENERAL PARTNER shall be authorized to deduct such amount from subsequent distributions due the defaulting PARTNER hereunder; or

(b) The PARTNERSHIP may tender to the PARTNER in default the amount paid to the PARTNERSHIP by the defaulting PARTNER and upon this occurrence, the delinquent PARTNER's interest in the PARTNERSHIP shall be terminated, and he shall cease to be a PARTNER of the PARTNERSHIP. For purposes of this paragraph any tender by the PARTNERSHIP to a defaulting PARTNER may be in the form of a PARTNERSHIP NOTE due and payable not more than one (1) year from the date of said tender, in negotiable form with the privilege of prepayment in whole or in part at any time, and from time to time, without interest.

## ARTICLE VI

### STATUS OF LIMITED PARTNERS

6.1 LIABILITY. A LIMITED PARTNER shall not be bound by, or be personally liable for, the expenses, liabilities or obligations of the PARTNERSHIP.

. . . .

6.3 STATUS OF PARTNERSHIP INTEREST. The PARTNERSHIP interest owned by a LIMITED PARTNER shall be fully paid and non-assessable except as provided in Paragraph 5.3 hereof. No LIMITED PARTNER shall have the right to withdraw or reduce his contribution to the capital of the PARTNERSHIP except as a result of the dissolution of the PARTNERSHIP, or as otherwise provided by and in accordance with law.

. . . .

## ARTICLE VIII

### STATUS OF GENERAL PARTNER

8.1 RESPONSIBILITY. The GENERAL PARTNER shall be solely responsible for the management of the PARTNERSHIP business with all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith.

. . . .

8.3 RIGHTS AND POWERS OF THE GENERAL PARTNER. The members of the GENERAL PARTNER shall contribute personally their time, skill and energy; their financial backing, advice and experience; arrange all financial and organizational matters for the PARTNERSHIP; contribute administrative and marketing services, and shall be the managing partner of the PARTNERSHIP. In addition to any other rights and powers which it may possess under law or by virtue of this Agreement and Certificate, the GENERAL PARTNER shall have all specific rights and power required or appropriate to its management of the PARTNERSHIP business which shall include but not be limited to, the following rights and powers on behalf of the PARTNERSHIP:

. . . .

(b) To borrow money and, if security is required therefor, to mortgage or subject to any other security device, any portion of the property of the PARTNERSHIP, to obtain replacements of any mortgage, security deed or other security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate, or extend any mortgage, security deed or other security device; all of the foregoing at such terms and in such amounts as they deem in their absolute discretion, to be in the best interest of the PARTNERSHIP.

Tennessee Code Annotated § 61–2–117 of the Uniform Limited Partnership Act reads in part as follows:

*Liability of limited partner to partnership.—*

(a) A limited partner is liable to the partnership:

(1) For the difference between his contribution as actually made and that stated in the certificate as having been made; and

(2) For any unpaid contribution which he agreed in the certificate to make in the future at the time and on the conditions stated in the certificate.

The prospectus, while not integrated into the contract, was offered as evidence in connection with the summary judgment motions by both parties. What is a prospectus and what is its role? Although this case involves individual shares in a real estate venture, an interest in a limited partnership is considered personal property. A prospectus is a selling document that may be used before the registration of the securities offered become effective, and in certain circumstances, it must be used after the registration becomes effective. On its face, the prospectus states that "THESE SECURITIES HAVE BEEN REGISTERED WITH THE SECURITIES DIVISION OF THE TENNESSEE DEPARTMENT OF INSURANCE, AS REQUIRED BY LAW." Furthermore, as an offering and selling document, a prospectus must contain a full and complete disclosure of all the material facts.

We now turn to those portions of the prospectus that this Court considers material to the issue before us. The very first page, entitled "CAVEAT," begins by saying that "[n]o person is authorized to give any information or to make any representation other than those contained in this Prospectus in connection with the offering contained herein, and information or representa-

1. The general partner was given ten percent.

2. The second mortgage will be payable only if resale results in a minimum of 25% return to

tations not herein contained, if given or made, must not be relied upon."

It would seem to us that the converse of that paragraph means that information or representations in connection with the offering of these securities contained in the prospectus may be relied upon.

The section entitled SUMMARY OF PROGRAM COSTS states that fifteen percent of the cost of the property, coupled with the acquisition costs due the general partner, will be assumed by the fifteen limited partners, as investors, in the amount of $5,874.88 each. The agreement of partnership reflects that each investor contributed this amount at the time of entering into the partnership. It also stated that "[d]uring the period that the property is held, interest on the first and second mortgages, plus taxes, will be paid by the Limited Partners by annual contributions of $1,671.01 (for interest payments) plus one-fifteenth ($1/15$) of the annual county property taxes."

It was further provided therein that each limited partner was to own one-fifteenth of ninety percent of the Ellendale Property,[1] and that each would be entitled to one-fifteenth of ninety percent of the net profits from the venture, which they hoped to realize at the time the property was sold.

There also appears in the prospectus, in tabular form, a summary of the program costs. This tabular presentation represents the initial contribution of $5,874.88 by each limited partner and also represents the July 1 payments of interest and property taxes for the years 1975 through 1983.

This same table shows that on July 1, 1983, in addition to the interest payment, a principal payment of $22,996.34 on the purchase money mortgage and a principal payment of $2,546.25 on the second mortgage,[2] was due to be paid. A footnote to the payment required of each limited partner on the first mortgage of July 1, 1983, stated:

the limited partner. We are thus not concerned with this issue.

It is anticipated that resale of the property will be made prior to the maturity date of this first mortgage, and the investor will not be called upon to make this contribution, the mortgage being paid out of the proceeds of the resale. See Item D, Page 18, for fuller explanation.

This "fuller explanation," found on page 18 of the prospectus, reads as follows:

This first mortgage will secure a note in the amount of $322,378.65, and the said note will mature eight (8) years from the date of closing. If, for market or other valid reasons, the property has not been resold by the Partnership before that date, the Limited Partners each will be obligated to pay into the Partnership one-fifteenth ($\frac{1}{15}$) of the balance due, or $21,491.91, plus his pro rata share of the final year's interest, for a total of $22,996.34 (see table on page 14).

■ Before examining the contentions of the respective parties as they relate to these documents, the relevancy of the prospectus needs to be determined. Admittedly, the prospectus is not a part of the partnership agreement. Neither side contends that it is. However, recognizing that the court is called upon to construe the partnership agreement, both sides, by stipulation, have agreed that the prospectus can be considered as evidence, and both sides rely upon various provisions of the prospectus. In our opinion, the prospectus can and should be considered as evidence of the intention of the parties at the time the contract was entered into. Stated another way, it is evidence of what is meant by the terms of the contract, for it is not disputed that Almacar and Ellendale prepared and disseminated the prospectus, and it is not disputed that the limited partners received the prospectus prior to signing the partnership agreement.

Ellendale and Almacar rely upon sections 5.3 and 6.3 of the partnership agreement as to the obligations of the limited partners and the right of a limited partner to withdraw or reduce his capital contribution. They also contend that subsections (a) and (b) of section 5.3 are not exclusive remedies, but are simply elections given to the limited partners, to be utilized by them in the event that there is an equity position in the partnership. Referring to the prospectus, they point to the risk factors as are there set out.

On the other hand, the limited partners claim that section 6.1 of the partnership agreement vitiates any liability on the part of the limited partners, as provided for by section 5.3, and contend that insofar as the prospectus is concerned, the payment provided for on July 1, 1983 to principal is in the form of a "call" only and is thus a contingent obligation.

■ This Court, as was the trial court, is faced with the responsibility of interpreting the contract—the partnership agreement—to ascertain the intentions of the parties to that contract and to give effect to that intention. We are of the opinion that the chancellor was in error in his interpretation. We are of the opinion that the doctrine of practical construction applies to this case, as discussed at length by our Supreme Court in *Hamblen County v. City of Morristown*, 656 S.W.2d 331 (Tenn. 1983). We once again take note of the unchallenged affidavit of Arnold Prather, one of Almacar's partners, which states that a prospectus was made available to all the limited partners. We shall, therefore, examine the partnership agreement in the light of this prospectus.

First, the prospectus states that the price to be paid for each unit was $5,874.88. Pages 4 and 5 of the partnership agreement reflect that the limited partners paid exactly that.

Next, the prospectus states in so many words that the limited partnership planned to own the property until such time as the general partner concluded that the resale of the property would yield the highest profit to the investors. By the same token, the partnership agreement states, in essence, the same thing—that is, that the partnership intended to hold the property as an investment for resale until it could be

sold to yield the highest profit to the partners.

Again, the prospectus, in both descriptive language and tabular form, states that during the time that the partnership owned the property, a *pro rata* share of the property taxes and the interest on the mortgages would be paid by annual contributions of the limited partners. Turning to the partnership agreement, section 5.3 states that, as funds were needed for payment of interest and property taxes with respect to the partnership asset, if there were no funds available in the partnership, each of the partners, when called upon to do so, would pay his proportionate share.

The prospectus, again in tabular form and by specific language, also states that if the property was not sold by the partnership prior to the maturity of the first mortgage, the limited partners would be obligated to pay into the partnership their *pro rata* share of the balance due on the principal. Turning again to the partnership agreement, section 5.3, found under Article V, entitled PARTNERSHIP INTERESTS AND CAPITAL CONTRIBUTIONS, also provides that if funds were needed for the payment of principal on the partnership debt and were not available to the partnership, upon demand by the general partner, each partner would pay his proportionate share. Furthermore, the fully paid status of each limited partner's interest in the partnership has, as a stated exception, those provisions in section 5.3 above referred to.

In *Hamblen County*, our Supreme Court was faced with the interpretation of a contract between the City of Morristown and Hamblen County relating to the operation of two public high schools. In resolving the issue there presented, Justice Brock (now Chief Justice), set forth several principles of the law of contracts that weighed upon the consideration of the facts of that case. Several of them are applicable to the case *sub judice*. The first is the rule of practical construction. As stated by the Court at page 335:

The rule of practical construction is particularly applicable to this case. That rule, long recognized and applied in this jurisdiction, is that the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered. [citations omitted].

The rule is stated in Section 235 of the *Restatement of Contracts* as follows:

"If the conduct of the parties subsequent to a manifestation of intention indicates that all of the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation."

Applying that rule to the facts before us, both the prospectus and the partnership agreement reflect that the purpose of the partnership was to hold raw land as a speculative investment, that the partnership encumbered the raw land with a secured indebtedness, and that the limited partners were supposed to provide the funds to pay their *pro rata* shares of interest and property taxes.

We do not think that the limited partners can now be heard to say that the above-mentioned items are "expenses" of partnership, and that they are not liable for the expenses when in three consecutive years, all, and four consecutive years, most, of the limited partners paid their *pro rata* share of the interest and property taxes when called upon to do so.

■ By the same token, we are of the opinion that their position to the effect that they owe nothing on the principal is inconsistent with the payments they made for their *pro rata* share of the interest and taxes, when the very same section—5.3—of the partnership agreement states that the general partner had the right to call upon them for *pro rata* payments to principal, as well.

Again, our benchmark is Hamblen County and those principles governing the law of contracts, found at page 334.

Also applicable here is a principle which has been aptly stated as follows: "The court in interpreting words or other acts of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement." *Restatement of Contracts*, § 235(d) and Comment.

Particularly pertinent here is the following principle:

"Intention or meaning in a contract may be manifested or conveyed either expressly or impliedly, and it is fundamental that that which is plainly or necessarily implied in the language of a contract is as much a part of it as that which is expressed. If it can be plainly seen from all the provisions of the instrument taken together that the obligation in question was within the contemplation of the parties when making their contract or is necessary to carry their intention into effect, the law will imply the obligation and enforce it." 17 Am.Jur.2d *Contracts* § 255 (1964) at 649.

At the time and under the circumstances that the limited partners signed the partnership agreement, they had each been furnished a copy of the prospectus that set forth the material facts concerning the offering. Applying the principles to the case at bar, we conclude that the language found in sections 5.3 and 6.3 implies that the obligation in question—the *pro rata* responsibility to pay toward principal—was within the contemplation of the parties when they signed the partnership agreement.

Clearly, the partnership agreement did not anticipate that the limited partners would trigger a default on the loan, thus resulting in foreclosure prior to its maturity. In our opinion, to draw a legal distinction between a payment of principal when the debt becomes due and a payment of a part of a deficiency judgment following foreclosure, which is also principal, places form over substance.

For these reasons, the decree of the chancellor granting summary judgment for the limited partners is reversed. This motion is denied. The decree of the chancellor denying the motion for partial summary judgment of Ellendale and Almacar is reversed and said motion is granted. Inasmuch as there is no proof in the record from which the dollar amount of liability of each individual limited partner to Ellendale and Almacar can be ascertained, this cause is remanded to the Chancery Court of Shelby County for the determination of damages in accordance with this opinion. Costs in this cause are taxed to the limited partners, for which execution may issue, if necessary.

HIGHERS, J., and McLEMORE, Special Judge, concur.