IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 28, 2004

**J.L. MAC-TN, INC. v. STATE OF TENNESSEE, ET AL.**

Appeal from the Tennessee Claims Commission
No. 20101618

---

No. M2003-01057-COA-R3-CV - Filed February 24, 2004

---

J.L. Mac-Tn, Inc. and the State contracted for J.L. Mac's provision of tire shredding services at the various county disposal facilities requiring those services. Subsequent to that contract, the state legislature established new procedures for tire disposal requiring the counties to find an end use for the shredded tires, and eventually prohibiting the land filling of shredded tires. The amount of services required of J.L. Mac under the contract were significantly reduced. J.L. Mac commenced this action seeking damages for alleged breach of the contract for shredding services. The Claims Commission granted summary judgment to the State. From that summary judgment J.L. Mac appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Claims Commission Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

Richard J. Braun, Patricia E. Crotwell, Nashville, Tennessee, for the appellant, J.L. Mac-TN, Inc.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General, Kae Carpenter Todd, Assistant Attorney General, for the appellee, State of Tennessee and Tennessee Department of Environment and Conservation.

**OPINION**

In 1991, as part of the Solid Waste Management Act of 1991, the State prohibited the disposal of whole, unshredded tires in landfills effective 1995. 1991 Public Acts, ch. 451. By that same public act the State also authorized the Department of Environment and Conservation to contract for tire shredding services as necessary. Section 36 of Public Chapter 451 as codified in Tennessee Code Annotated section 68-211-867 provides the following specifics regarding the Department's authority to contract:

(c)     From funds available from the solid waste management fund, the department shall obtain six (6) mobile tire shredders and operate them throughout the State as waste tire disposal needs may require.  The department is authorized to contract for the services of a shredder in lieu of purchasing a shredder.  If the department contracts for the services of a shredder with a county or municipality that local government may receive a rebate on the state surcharge paid in its locality on the tipping fee authorized by this act for the budget allocation for a shredder.

(d)     From funds available from the solid waste management fund, the state planning office shall offer to counties a one-time-only grant to assist counties in locating, collecting, and appropriately disposing of waste tires.

1991 Tenn. Pub. Acts 451 s. 36, Tenn. Code Ann. § 68-211-867 (1991).

Section 867(d) was amended in 1996 to provide,  "(d)  From funds available from the solid waste management fund, the department may offer to counties grants to assist counties in locating, collecting, and appropriately disposing of waste tires."  1996 Tenn. Pub. Acts 846.

Against this statutory backdrop, the Department of Environment and Conservation published a Request for Proposal in April of 1997 seeking contract bids for the provision of tire shredding services.  The State referenced the aforementioned statute in its Request.  In addition, the State provided a *pro forma* contract, invited prospective service providers to attend a question and answer session and allowed written questions to be submitted which, along with their answers, would be included in any subsequent contract.  Also attached to the R.F.P. was a map indicating the counties using state provided tire shredding services at the time of the issuing of the request.  Appellant, J.L. Mac, submitted the winning bid, and was awarded the tire shredding services contract in 1997.  On February 26, 1998, the state legislature passed Chapter 587 of the 1998 Public Acts which amended section 867 in its entirety and supplied in its place the following pertinent language:

(c)(1) From funds available from the solid waste management fund, the department shall contract for services of a mobile tire shredder to operate throughout the state as waste tire disposal needs may require.  If the department contracts for the services of a shredder with a county or municipality, such local government may receive a rebate on the state surcharge paid in its locality on the tipping fee authorized by the part for the budget allocation for a shredder.

(2) The department is authorized to use funds available from the solid waste management fund to contract directly with an approved beneficial end user or their designated agent for recycling of waste tires.  Each beneficial end user or agent awarded such a contract shall demonstrate to the department's satisfaction the ability to provide collection, management and transportation to its facility of all eligible and available waste tires generated within the area or county specified by the department.  Any such contract shall be subject to approval by the county legislative body of each

county in whose territory the contract shall be operative. Any such contract shall also require an appropriate performance bond from any entity producing tire-derived fuel or crumbling or pyrolysis of the tire material to insure proper storage, transportation and ultimate sale or disposal of such materials.

(3)     From funds available from the solid waste management fund, the department may provide grants to assist counties in locating, collecting and appropriately disposing of waste tires. Any county receiving a grant under this subdivision after July 1, 2000, shall not assess a tipping fee on the waste tires received at a county waste tire collection site so long as the amount of the grant covers the cost of the county's waste tire management program.

(d)(1)   A landfill shall not accept whole, unshredded waste tires for disposal. Landfill operators shall segregate whole, unshredded waste tires at landfills and provide a temporary storage area for such tires until tires are transported to an appropriate facility to be used for an approved beneficial end use as defined in this section or the tires are shredded and disposed of pursuant to subsection (d)(2) and regulations promulgated by the board.

(2)     A *county may not dispose of shredded waste tires in a landfill after July 1, 2002, if the county's net cost for shredding, transporting and disposing of waste tires exceeds the cost of an available beneficial end use.* Nothing in this subsection shall prohibit a county from electing to participate in a beneficial end use for waste tires at a cost that exceeds the county's net cost for shredding, transporting and disposing of waste tires in a landfill.

1998 Pub. Acts Ch. 587, s. 1 (emphasis added).

These legislative enactments reflect the ongoing State policy of reducing the amount of landfill space occupied by whole tires, lead batteries, and other toxic substances as well as recyclables. As a consequence of this policy, the services provided by J.L. Mac were continuously reduced to the point that the contract was not renewed in 2002. Appellant, J.L. Mac, complains that this very legislative reduction of the State's need for shredding services in the various counties amounts to a breach of the tire shredding services contract. J.L. Mac's claim filed with the Tennessee Claims Commission contains the following breach of contract allegations:

11. Commencing in or about March 1999 and continuing thereafter to date, Respondents have breached and violated the terms of the referenced contract for waste tire shredding by prohibiting Claimant from shredding tires in a substantial number of counties without any agreed amendment to the contract for removing such counties from the contract and directing Claimant not to visit such sites for the purpose of shredding tires in violation of the aforesaid contract.

12. As a direct and proximate result of the above-referenced breaches of contract, Claimant has been injured and suffered substantial damage in that its costs of shredding waste tires at the sites it has been required and directed to service have been substantially increased and its profitability has been substantially reduced. Sites which were wrongfully and unilaterally eliminated from the contract by Respondents have transferred truck and other large tires to sites which Claimant is required to service under the contract, substantially altering the ratio of passenger care tires to large tires.

The parties do not dispute that the agreement between them encompasses not only the written contract, but also the Request for Proposals as well as the written questions and answers generated in connection with the R.F.P. The Request expresses the intent of the State in the following paragraphs:

1. Under the provisions of Tennessee Code Annotated (TCA) Section 68-211-867(c), the Tennessee Department of Environment and Conservation, hereinafter referred to as the State, is soliciting proposals for the purpose of securing a contract for the service of processing motor vehicle waste tires. For the purpose of this Request for Proposals, waste tires are defined as tires removed from Tennessee motor vehicles which are defined by T.C.A. Section 67-4-1602 (4), as "any vehicle used in the transportation of persons or property on streets or highways, including automobiles, motorcycles, trucks, trailers, semi-trailers and truck/semitrailer combinations, and also including farm tractors, trailers and machinery, but not including vehicles propelled solely by human muscular power, such as bicycles;" Furthermore, T.C.A. Section 67-4-1602 (9) defines "tire" as a "continuous solid or pneumatic rubber covering encircling the wheel of a motor vehicle." Heavy machinery tires, solid rubber tires, aircraft tires, high flotation tires greater than 12 inches in width, previously cut, chopped or sliced tires, tires containing metal wheels, and otherwise qualifying tires with a wheel opening greater than 42 inches are excluded from this Request For Proposals.

2. The State of Tennessee has approximately 4,877,145 residents (based on the 1990 census). It is estimated that each resident generates approximately 0.8 waste tires annually, equaling approximately 3,901,716 tires statewide. Tennessee Code Annotated (T.C.A.) Section 68-211-867(a) prohibits landfills from accepting whole, unshredded tires for disposal after December 31, 1994. In T.C.A. Section 68-211-866(b), counties are (in part) directed to provide a temporary collection and storage area for waste tires until a mobile tire shredder shreds the waste tires, the tires are transported to an appropriate disposal facility or the tires are otherwise disposed of pursuant to regulations promulgated by the Solid Waste Disposal Control Board. It is the intent of the State that only one site per county will be serviced by the Contractor. The

-4-

processed waste tires are the property of the waste tire collection site operator, who is responsible for their subsequent disposal or other use.

. . . .

4. The potential for breeding disease-carrying vermin, damage to landfills caused by whole tires floating to the surface, and pollution of air and ground and surface water resources in the event of fires exists if these whole waste tires are not properly managed.

5. The purpose of this Request for Proposal (RFP) is to define the State's minimum requirements, solicit proposals, and to gain adequate information from which the State may evaluate the services which you have to offer. The state makes no representation as to the number of tires which will be processed during the term of the contract.

The Request further provided the following information:

II. GENERAL INSTRUCTIONS:
   A. Submission of Proposal

   . . . .

3. All written questions shall be mailed or hand carried, on business letterhead, and be directed to Bill Dobbins, Deputy Director, at the address indicated in Section IIA.1. above. Each letter submitting questions must clearly identify the RFP No. 327.42-022, Waste Tire Processing, in the body of the letter and on the envelope and should specify the RFP sections to which questions pertain. The State shall be bound only by written responses to written questions concerning this RFP.

4. The State shall respond to all timely submitted written questions, in writing, as indicated in the Schedule of Events. Written responses to all written questions will be mailed no later than April 29, 1997, to firms that received this RFP. These questions and written responses will be included in the RFP thereby, as an amendment. Names of firms

5. A Proposer's Conference will be held in Nashville, Tennessee, at 2:00 P.M. (CDT) on April 14, 1997. The location of this conference will be:

        17th Floor Conference Room B
   L & C Tower, 401 Church Street, Nashville Tennessee

6. Any firm desiring to submit a proposal as a contractor in response to this RFP should have at least one representative at the conference. All expenses incidental to attending the conference must be borne by the attendee. Prior receipt of an RFP is not a requirement to attend the conference. Requests for Proposals will be available at the conference for representatives of firms not previously sent an FRP.

7. The purpose of this conference is to allow an open forum for discussion and questions about the RFP with all potential proposers having equal opportunity to hear and participate. Oral questions will receive oral responses, neither of which will be official nor become a part of the RFP. All written questions submitted on business letterhead prior to or upon registration at the conference will be read aloud and will receive unofficial oral responses at the conference followed by an official written answer. Written questions submitted at the conference, and any subsequent questions, must be presented to Bill Dobbins, at the address indicated in Section II.A.1., as described above. No oral questions will receive responses after the adjournment of the proposers' conference.

The contract executed by the parties upon successful bid by J.L. Mac establishes, *inter alia*, the following scope of services:

A. SCOPE OF SERVICES:

1. The Contractor shall establish a schedule (subject to State approval) for the processing of waste tires at the waste tire collection facilities designated by the respective county executives and approved by the State. The State will determine how frequently each site must receive service. Each site shall receive service at least two (2) times per contract year. The State reserves the right to alter the Contractor's schedule based on unusual or emergency situations. During the term of the Contract, the Contractor shall comply with the approved schedule unless revisions are approved by the State.

The written contract provided for compensation on a per unit basis. The original term of the contract was from July 1, 1997 through June 30, 1999. The State retained the option for up to three renewals of twelve months each. Subsequent to the execution of the original contract, the State renewed the term through June 30 of 2001 noting the R.F.P. was also accompanied by a map indicating "counties currently using state contractor for shredding." On or about April 29, 1997, the State released the written questions and answers referenced in the request for proposal. Of particular note is question 17:

Question #17: As county site operators shift to end-use contracts, how fast is the number expected to rise in the future?

Answer #17: The State cannot predict how many counties will shift to end-use contracts. However, fifteen counties have switched from shredding to end-use contracts from the previous fiscal year.

This appeal concerns the well settled rule that terms of contracts are enforced as written, unless, as a practical matter, the subsequent behavior of the parties indicates a contrary intent. *See e.g., Petty v. Sloan*, 197 Tenn. 630, 637-38, 277 S.W.2d 355, 358 (Tenn.1955); *see also Appling v. Ellendale 122 Property*, 718 S.W.2d 261, 266 (Tenn.Ct.App.1986)(applying the "doctrine of practical construction" as discussed in *Hamblen Co. v. City of Morristown*, 656 S.W.2d 331 (Tenn.1983)).

In "resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn.1999). This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide. 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn.2001).

A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous. Once found to be ambiguous, a court applies established rules of construction to determine the parties' intent. "Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a question of fact" appropriate for a jury. *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981).

*Planters Gin Co. v. Federal Compress and Warehouse, Inc., et al.*, 78 S.W.3d 885, 889-90 (Tenn.2002).

J.L. Mac's contract with the State made no statements as to the actual amount of tires to be processed or counties which would choose J.L. Mac's services with the approval of the department. In fact, the map and list, along with the written questions appended to the contract, indicate an inherent risk that the number of counties utilizing J.L. Mac's services would change.

According to the unambiguous language, the shredder who successfully bid for the State contract would supply shredding services at the waste tire facilities designated by the respective county executives and approved by the state. In its statement of intent the Department referenced the Code section under which it sought tire shredding services, indicated the counties currently utilizing those services, and specifically stated that it was unable to determine whether the number

of counties using these services would stay the same, increase or decrease. The parties do not dispute that more and more counties moved away from using state provided shredding services. It is likewise undisputed that the State legislated out of existence the ability of counties to use state provided services in preference of beneficial end-use providers. Appellant poses to this Court the same question addressed to the Claims Commission: whether J.L. Mac assumed the risk of this legislative decrease, or whether the State promised, either expressly in the contract or by a good faith covenant of fair dealing, to refrain from reducing the number of counties requiring state shredding services, and thereby the number of tires J.L. Mac would shred.

The threshold to any determination of contractual liability in state contracts is the recognition that contractors are on notice of all State legislative powers which may affect those contract rights. It is for this very reason that the R.F.P. provided statutory reference for its duty to provide the shredding services to the various counties. "No governmental entity can by contract deprive itself of inherent powers necessary to the performance of its function or of power or duty imposed upon it by prior express statutory or constitutional provision." *Douglas v. Kentucky*, 168 U.S. 488, 42 L.Ed. 553 (1897). *See also, Stone v. Mississippi*, 101 U.S. 814, 25 L.Ed. 1079 (1880); *Batson v. Pleasant View Util. Distr.*, 592 S.W.2d 578, 581 (Tenn.Ct.App.1978).

Not even the United States Constitution provision prohibiting the impairment of the obligation of contract as contained in Article I, section 10 of that document prevails over the inherent power of the state to safeguard the vital interest of its people or to protect public health and morals. In a leading case on this issue, the United States Supreme Court has stated:

> Not only is the constitutional provision qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect." *Stephenson v. Binford*, 287 U.S. 251, 276, 77 L. Ed. 288, 301, 53 S. Ct. 181, 87 A.L.R. 721. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while, – a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.
>
> . . . .
>
> "But into all contracts, whether made between states and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself. They are superinduced by the pre-existing and higher authority of the laws of nature, of nations or of the community to which the parties

belong.  They are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force.  Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur."

The legislature cannot "bargain away the public health or the public morals."

*Home Building & Loan Asso. v. Blaisdell*, 290 U.S. 398, 434-35, 78 L.Ed. 413, 426-428 (1934) (quoting *Long Island Water Supply Co. v. Brooklyn*, 166 U.S. 685, 692, 41 L.Ed. 1165, and *Stone*, 101 U.S. at 819) (footnotes omitted).

This long standing rule is tempered by the equally well settled rule that a state may not use its reserved power over public health and morals as an instrument to alter its contractual obligations in matters purely proprietary and having no connection with the inherent powers necessary for the state to govern.  *W.B. Worthen Co. v. Cavanaugh*, 295 U.S. 56, 79 L.Ed. 1298 (1935); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 52 L.Ed.2d 92 (1976).

It can hardly be said that the subject of solid waste disposal is anything other than a major concern of state government as relates to the health and welfare of its citizens.  Chapter 451 of the Public Acts of 1991 so states:

(a)      It is declared to be the policy of this state, in furtherance of its responsibility to protect the public health, safety and well-being of its citizens and to protect and enhance the quality of its environment, to institute and maintain a comprehensive, integrated, state-wide program for solid waste management, which will assure that solid waste facilities, whether publicly or privately operated, do not adversely affect the health, safety and well-being of the public and do not degrade the quality of the environment by reason of their location, design, method of operation or other means and which, to the extent feasible and practical, makes maximum utilization of the resources contained in solid waste.
(b)      It is further declared to be the policy of this state to educate and encourage generators and handlers of solid waste to reduce and minimize to the greatest extent possible the amount of solid waste which requires collection, treatment, incineration or disposal through source reduction, reuse, composting, recycling and other methods.
(c)      It is further declared to be the policy of this state to promote markets for, and engage in the purchase of, goods made from recovered materials and goods which are recyclable.  [Acts 1991, ch. 451, § 3; T.C.A., § 68-31-803.]

Tenn. Code Ann. § 68-211-803 (2001).

When the contract in issue is considered in all of its parts no breach of contract has occurred. From the very start the progression in waste tire disposal from whole tires in a landfill to shredded tires in a landfill to recycling of waste tires which would completely relieve the landfill of these burdens, to the end result envisioned by the statutory scheme is obvious. A "beneficial end use" as used in the contract documents is synonymous with "recycling." That all parties to the contract envisioned at the beginning the very course of events that has occurred is evidenced by question number 17 and its answer.

> Question #17: As county site operators shift to end-use contracts, how fast is the number expected to rise in the future?

> Answer #17: The State cannot predict how many counties will shift to end-use contracts. However, fifteen counties have switched from shredding to end-use contracts from the previous fiscal year.

Persons contracting with government entities have the comfort of relying on the almost certain solvency of the sovereign. There are also pitfalls. Ward and Briggs contracted with the directors of the state penitentiary to lease prison labor only to be thereafter met by wholesale pardon of prisoners granted by the governor. When they sought damages from the state, the supreme court held:

> The lessees are presumed to have entered into the contract of hire of the convicts, with a knowledge of and in reference to, the constitutional power of the Governor to grant pardons. It may be true, that in making the contract, they could not reasonably anticipate the extraordinary exercise of the pardoning power, which, within a few weeks, deprived them of three-fourths of the convicts whose labor they had hired. It may be true, that this unusual reduction of the number of their hirelings may have resulted in heavy loss and damage to to (sic) them. But it must be borne in mind, that they entered into the contract in reference to the prevailing law, that the government does not guaranty to any person the fidelity of any of its officers or agents, whom it employs. The lessees therefore voluntarily took upon themselves the risk as to the Governor's ordinary or extraordinary exercise of the pardoning power.

*State v. Ward*, 56 Tenn. 100, 126 (1871).

Under the circumstances, J.L. Mac assumed the risk of a reduction in the number of counties using the tire shredding services, especially in light of the statutory policy of the State to reduce landfill use and for the prohibition of any land filling of whole or unshredded tires by 2002. The summary judgment of the Claims Commission is affirmed in all respects. Costs on appeal are taxed against J.L. Mac.

_____
WILLIAM B. CAIN, JUDGE